68 F.3d 1347
 17 ITRD 1961
 The TORRINGTON COMPANY, Plaintiff-Appellant,
Federal-Mogul Corporation, Plaintiff,
v.
The UNITED STATES, Defendant-Appellee,
and
SKF USA Inc. and SKF GmbH, Defendant-Appellees,
and
NTN Kugellagerfabrik (Deutschland) GmbH, Defendant-Appellee,
and
Ina Walzlager Schaeffler KG and Ina Bearing Company, Inc.,
Defendant-Appellees,
and
FAG Kugelfischer Georg Schafer KGaA, Defendant-Appellee.
The TORRINGTON COMPANY, Plaintiff-Appellant,
Federal-Mogul Corporation, Plaintiff,
v.
The UNITED STATES, Defendant-Appellee,
and
SKF USA Inc. and SKF Industrie, S.p.A., Defendant-Appellees,
and
FAG Cuscinetti S.p.A., Defendant-Appellee.
 Nos. 95-1134, 95-1135.
 United States Court of Appeals,
Federal Circuit.
 Oct. 24, 1995.
 
 Wesley K. Caine, Stewart & Stewart, Washington, DC, argued for plaintiff-appellant in appeal nos. 95-1134 and 95-1135. With him on the brief were Terence P. Stewart, Geert DePrest and Lane S. Hurewitz. Of counsel was James R. Cannon, Jr.
 Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Department of Justice, Washington, DC, argued for defendants-appellees, The United States, in appeal nos. 95-1134 and 95-1135. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Berniece A. Browne, Senior Counsel, Thomas H. Fine and Dean A. Pinkert, Attorney-Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce. Herbert C. Shelley, Howrey & Simon, Washington, DC, argued for defendants-appellees, SKF USA Inc. and SKF GmbH, in appeal no. 95-1134. With him on the brief was Alice A. Kipel. Stephen L. Gibson, Arent Fox Kintner Plotkin & Kahn, Washington, DC, argued for defendants-appellees, INA Walzlager Schaeffler KG and INA Bearing Company, Inc., in appeal no. 95-1134. With him on the brief was Peter L. Sultan.
 Max F. Schutzman, Grunfeld, Desiderio, Lebowitz & Silverman, LLP, of New York City, argued for defendant-appellee, FAG Kugelfischer Georg Schafer KGaA, in appeal no. 95-1134 and FAG Cuscinetti S.p.A., in appeal no. 95-1135. With him on the brief were Andrew B. Schroth and Mark E. Pardo. Of counsel were David L. Simon and Jeffrey S. Grimson.
 Donald J. Unger, Lawrence M. Friedman and Kazumune V. Kans, Barnes, Richardson & Colburn, Chicago, IL, were on the brief for defendant-appellee, NTN Kugellagerfabrik (Deutschland) GmbH, in appeal no. 95-1134.
 Before ARCHER, Chief Judge, PLAGER and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 These consolidated cases present two questions of statutory interpretation arising out of an administrative review of antidumping duty orders. The first question concerns what constitutes "good cause," within the meaning of 19 U.S.C. Sec. 1677e(b)(3)(B) (1988), to require the Commerce Department to verify the information it relied on in conducting the administrative review. The second question is whether the Commerce Department may lawfully reduce the potential antidumping duties on goods imported into this country by taking into account pre-sale transportation expenses associated with the sale of like goods in the manufacturers' home markets. We conclude that the Court of International Trade correctly resolved both questions, and we therefore affirm.
 
 
 2
 * In 1990, the International Trade Administration of the Commerce Department (Commerce) initiated administrative reviews of antidumping duty orders covering antifriction bearings from Germany and Italy. The Torrington Company, an American manufacturer of antifriction bearings, filed requests that Commerce verify all information upon which it would base its determinations in those reviews. In response to questionnaires from Commerce, the foreign companies that were subject to the reviews submitted information regarding their production costs for the imported bearings. Torrington then filed objections to the companies' responses, arguing inter alia that several of the companies had changed their cost accounting systems for the purpose of antidumping reporting.
 
 
 3
 Commerce originally scheduled on-site verifications for several of the companies. It subsequently canceled the verifications, however, citing as one factor the outbreak of the Persian Gulf War, which had made European air travel less safe for Commerce Department personnel. Torrington objected to the cancellations and suggested that Commerce postpone the verifications until after air travel was safer or, in the alternative, that it conduct verification of the pertinent data in Washington, D.C. Commerce declined to pursue either option, stating that it was satisfied with the responses it had received.
 
 
 4
 Torrington filed complaints in the Court of International Trade, challenging Commerce's failure to conduct the verifications. In addition, Torrington argued that it was improper for Commerce to deduct an importer's pre-sale home-market transportation expenses from the calculation of foreign market value, a key element in determining the antidumping duty.
 
 
 5
 The Court of International Trade affirmed Commerce on both questions but remanded to the agency on other issues. Torrington Co. v. United States, 832 F.Supp. 365 (Ct.Int'l Trade 1993) (Italy); Torrington Co. v. United States, 832 F.Supp. 379 (Ct.Int'l Trade 1993) (Germany). Following the proceedings on remand, Torrington asked the Court of International Trade to reconsider its ruling on pre-sale home-market transportation expenses in light of this court's intervening decision in Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398 (Fed.Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994) ("Ad Hoc I "). The court declined to do so, holding that Ad Hoc I did not address the question presented in this case. Torrington Co. v. United States, 850 F.Supp. 7 (Ct.Int'l Trade 1994) (Italy); Torrington Co. v. United States, 850 F.Supp. 12 (Ct.Int'l Trade 1994) (Germany). After a further remand for clarification of Commerce's policy on home-market transportation expenses, the Court of International Trade once again upheld Commerce's treatment of those expenses. Torrington Co. v. United States, 866 F.Supp. 581 (Ct.Int'l Trade 1994) (Germany); Torrington Co. v. United States, 866 F.Supp. 1434 (Ct.Int'l Trade 1994) (Italy).
 
 
 6
 Torrington took this appeal. It contends that the Court of International Trade erred in upholding Commerce's decision not to conduct verifications and in allowing Commerce to deduct pre-sale home-market transportation expenses from the calculation of foreign market value.
 
 II
 
 7
 The statute on which Torrington relies for its claim that Commerce was obligated to conduct the verifications is 19 U.S.C. Sec. 1677e(b) (1988). That statute provides that upon receiving a request from an interested party, Commerce must verify the information on which it relies in an administrative review if either (1) the two immediately preceding administrative reviews were conducted without verification, or (2) "good cause for verification is shown." 19 U.S.C. Sec. 1677e(b)(3)(B) (1988).
 
 
 8
 Because these were the first administrative reviews of the antidumping duty orders for antifriction bearings, verification was not required unless there was a showing of "good cause for verification" within the meaning of section 1677e(b)(3)(B). Torrington argues that the "good cause" standard set forth in the statute is an objective one and that the standard was met in this case. Commerce, however, has promulgated a regulation that interprets the "good cause" standard as subjective. The pertinent regulation, found at 19 C.F.R. Sec. 353.36(a)1(iv), states that the "Secretary will verify all factual information the Secretary relies on in ... [t]he final results of an administrative review ... if the Secretary decides that good cause for verification exists." In order to prevail on its view that the "good cause" standard is objective, Torrington must establish that the regulation is contrary to the terms of the statute and therefore beyond the Department's power to adopt.
 
 
 9
 When we review a regulation that the Commerce Department has promulgated in interpreting the antidumping laws, the first question is whether Congress has spoken to the precise question at issue. See Torrington Co. v. United States, 44 F.3d 1572, 1577 (Fed.Cir.1995); Koyo Seiko Co. v. United States, 36 F.3d 1565, 1571 (Fed.Cir.1994); see generally Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Nothing in the language of the statute addresses the question whether the "good cause" standard is subjective or objective. Nor is there anything in the legislative history that supports Torrington's claim that Congress intended to create an objective test for "good cause."
 
 
 10
 Torrington cites one piece of legislative history--a House report commenting that "[g]ood cause could be such factors as a significant issue of law or fact, changed or special circumstances, discrepancies found in previous verifications, or the likelihood of a significant impact on the result." H.R.Rep. No. 725, 98th Cong., 2d Sess. 43 (1984). That report, however, does not speak in objective or mandatory terms; it merely lists some factors that could constitute "good cause."
 
 
 11
 In the absence of clear direction from the statute, we must ask the second question: whether the Commerce Department's regulation is based on a permissible interpretation of the statute. See Chevron, 467 U.S. at 843 & n. 11, 844, 104 S.Ct. at 2781 & n. 11, 2782; Suramerica De Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed.Cir.1992). In antidumping cases, we accord substantial deference to Commerce's statutory interpretation, as the International Trade Administration is the "master" of the antidumping laws. Daewoo Elecs. Co. v. International Union, 6 F.3d 1511, 1516 (Fed.Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994); see also Koyo Seiko Co. v. United States, (Fed.Cir.1995), 66 F.3d 1204, 1207-08; Timken Co. v. United States, 37 F.3d 1470, 1474 (Fed.Cir.1994); Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc., 753 F.2d 1033, 1039, 3 Fed.Cir. (T) 83, 90 (1985).
 
 
 12
 The Commerce Department's determination that the Secretary retains substantial discretion in deciding when "good cause" for verification is shown is a permissible interpretation of section 1677e(b)(3)(B), particularly in light of the general principle that agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources. See, e.g., Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Accepting Torrington's construction of the statute would put the Court of International Trade and this court in the position of routinely second-guessing the Secretary's decisions regarding whether to conduct verification in particular cases, a role for which courts are ill-suited and one that could be quite disruptive of Commerce's effort to establish enforcement priorities.
 
 
 13
 In light of Commerce's construction of the statute, the verification issue turns on whether Commerce abused its discretion by canceling the verifications for the foreign companies, that is, whether Commerce's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). On the record in this case, we conclude that Commerce considered the relevant factors and did not commit a clear error of judgment.
 
 
 14
 In explaining its decision to cancel the verifications, Commerce stated that it looked at many factors and that "[a]mong the Department's considerations were the volume and significance of a particular firm's shipments from the country under review, as well as our evaluation of the credibility of the data submitted by that firm in the context of the review under consideration." Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, 56 Fed.Reg. 31,692, at 31,740 (Dep't Comm.1991) (final results). Commerce further explained that in light of its evaluation of the information from the companies that it had examined, "the fact that a particular firm may have modified its cost system prior to the start of these reviews is not an overriding consideration." Id. Finally, Commerce noted that, "given the large number of firms involved in these reviews and the time, resources and other constraints of the Department, total verification was not possible." Id.
 
 
 15
 Commerce must necessarily take many factors into account in determining which administrative review proceedings call for verification. Under the subjective "good cause" standard, the Secretary is entitled to weigh the need for verification in a particular case against the burden that verification would impose on agency resources. In this case, the Secretary determined that the need for verification was not great and that the burden would be substantial. Although Torrington questions the Secretary's decision on the question of need, we are not prepared to find that the Secretary's considered determination of that issue constituted a clear error of judgment.
 
 
 16
 Moreover, contrary to Torrington's submission, there is no per se rule requiring Commerce to go through with scheduled verifications once it has announced an intention to conduct verifications in a particular case. The agency may revisit the question whether good cause has been shown for verification, just as it may alter its assessment of any other matter falling within its discretion to decide.
 
 
 17
 Finally, because it was not improper for Commerce to cancel the verifications, it was lawful for Commerce not to resort to a compromise option, such as conducting off-site verifications in Washington, D.C. We therefore uphold the decision of the Court of International Trade on the verification issue.
 
 III
 
 18
 * Resolution of the pre-sale home-market transportation issue requires an understanding of the antidumping statute. The entire statutory scheme was recently overhauled by the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) (URAA). The URAA, however, does not apply to administrative reviews initiated prior to January 1, 1995. See URAA Sec. 291(a)(2), (b). In the case at bar, therefore, we construe the version of the statute that preceded the URAA.
 
 
 19
 The purpose underlying the antidumping laws is to prevent foreign manufacturers from injuring domestic industries by selling their products in the United States at less than "fair value," i.e., at prices below the prices the foreign manufacturers charge for the same products in their home markets. If the International Trade Commission determines that a domestic industry may be materially injured or retarded by the importation of particular goods, and the price of those imported goods sold in the United States (referred to as "United States price," 19 U.S.C. Sec. 1677a (1988)) is less than the price of the same goods sold in the manufacturer's home market (referred to as "foreign market value," 19 U.S.C. Sec. 1677b (1988)), antidumping duties will be assessed in the amount of the difference. 19 U.S.C. Sec. 1673 (1988).
 
 
 20
 The antidumping statutes define United States price by reference to either "purchase price" or "exporter's sales price," whichever is appropriate to the manufacturer's marketing system. 19 U.S.C. Sec. 1677a(a) (1988). "Purchase price" is the price at which a foreign manufacturer sells goods to an independent importer. 19 U.S.C. Sec. 1677a(b) (1988). "Exporter's sales price," which is used in place of purchase price when the foreign manufacturer makes sales in this country through a related importer or distributor, is the price at which the manufacturer's agent sells products to independent purchasers in the United States. See Torrington Co., 44 F.3d at 1575. The purpose of using either purchase price or exporter's sales price, as appropriate, is to ensure that the United States price reflects the price at which the goods are sold in an arm's length transaction, "whether the goods traveled through a related importer or through an unrelated, independent importer." Smith-Corona Group v. United States, 713 F.2d 1568, 1572, 1 Fed.Cir. (T) 130, 133 (1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).
 
 
 21
 On the other side of the antidumping duty ledger, Commerce calculates foreign market value by using one of several methods. The method used in this case was to review home-market sales to determine the market price of the same or similar products in the manufacturer's home market. See 19 U.S.C. Sec. 1677b(a)(1) (1988).
 
 
 22
 In general, the antidumping statutes seek to produce a fair, "apples-to-apples" comparison between foreign market value and United States price; to achieve that end, the statutes and Commerce Department regulations call for adjustments to the base value of both foreign market value and United States price to permit comparison of the two prices at a similar point in the chain of commerce. See Koyo Seiko, 36 F.3d at 1568; Smith-Corona, 713 F.2d at 1571-72, 1 Fed.Cir. (T) at 132-33. For example, when the United States price is calculated on the basis of the exporter's sales price, the United States price may be artificially high (compared to the United States price that would be produced by the "purchase price" method of calculation), because the exporter and its related affiliates will have generated expenses before selling the goods to an unrelated party in the United States. The statute therefore requires that, when the United States price is derived from the exporter's sales price, the United States price shall be adjusted by deducting all expenses incurred in selling the merchandise in the United States. See 19 U.S.C. Sec. 1677a(e) (1988).
 
 
 23
 That deduction, however, can have the effect of artificially depressing the United States price below the foreign market value (and thereby creating antidumping duties), because the home-market price on which the foreign market value is based will necessarily reflect some home-market selling expenses. Commerce has dealt with that problem in two ways. First, it deducts direct selling expenses (i.e., expenses related to a particular sale) in the manufacturer's home market from foreign market value under the "circumstances-of-sale" provision, 19 U.S.C. Sec. 1677b(a)(4)(B) (1988), which broadly authorizes Commerce to adjust foreign market value "if it is established to the satisfaction of [Commerce] that the amount of any difference between the United States price and the foreign market value" is due to "differences in circumstances of sale." See also 19 C.F.R. Sec. 353.56(a). Second, it deducts indirect selling expenses (i.e., expenses not related to a particular sale) from foreign market value when United States price is calculated based on exporter's sales price. That deduction, which is provided for by regulation, 19 C.F.R. Sec. 353.56(b)(2), is known as the exporter's sales price offset (or ESP offset). The regulation further provides, however, that the ESP offset may not exceed the amount of the deduction from United States price for indirect selling expenses. That limitation on the deduction from foreign market value for indirect selling expenses is referred to as the ESP offset cap. Commerce's authority to promulgate the ESP offset and ESP offset cap is well settled. See Smith-Corona, 713 F.2d at 1579, 1 Fed.Cir. (T) at 141; Consumer Prods. Div., SCM Corp., 753 F.2d at 1040, 3 Fed.Cir. (T) at 92; Koyo Seiko, 36 F.3d at 1574; Torrington Co., 44 F.3d at 1579-80.
 
 B
 
 24
 The practical problem at the core of this case is that some foreign producers ship goods from the factory to a warehouse or distribution center before shipping them to their home-market customers. When goods are shipped directly from the factory to the customer after a sale is made, or when goods are shipped to a warehouse for temporary storage following a sale, the post-sale transportation costs are treated as direct selling expenses. What is more problematic is how to deal with the foreign producers' pre-sale transportation costs, such as the costs of shipping goods to the warehouse when the goods are held in the warehouse in anticipation of later sale.
 
 
 25
 By statute, Commerce is required to deduct from the United States price all expenses incident to bringing goods from the place of shipment in the country of origin to the United States, regardless of whether the calculation of United States price is based on purchase price or exporter's sales price. See 19 U.S.C. Sec. 1677a(d)(2)(A) (1988). The statute does not direct that a corresponding deduction be made from foreign market value for home-market transportation expenses. In calculating United States price, Commerce treats the "place of shipment" as the factory where the goods are produced. See U.S. Dep't of Commerce, Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change 30 (Nov.1985); Red Raspberries From Canada, 56 Fed.Reg. 677 (Dep't Comm.1991) (final results). As a result, while United States price is calculated by deducting all expenses incurred after the goods leave the factory, the unadjusted foreign market value is not calculated in an equivalent manner, but includes the expenses of transporting the goods in connection with home market sales. Nihon Cement Co. v. United States, 17 Ct.Int'l Trade 400, 414-15, 1993 WL 185208 (1993).
 
 
 26
 Before the Ad Hoc I case, Commerce developed a scheme for addressing that disparity in treatment. It first divided all home-market transportation expenses into post-sale expenses and pre-sale expenses. It then deducted post-sale home-market transportation expenses from foreign market value under the statutory circumstances-of-sale provision, 19 U.S.C. Sec. 1677b(a)(4)(B) (1988). Pre-sale transportation expenses were regarded as indirect selling expenses, and were therefore deductible from foreign market value under the ESP offset when United States price was calculated on the basis of exporter's sales price. See Ad Hoc I, 13 F.3d at 400; Sharp Corp. v. United States, (Fed.Cir.1995), 63 F.3d 1092, 1096. In purchase price transactions, however, Commerce refused to deduct pre-sale home-market transportation expenses. See Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 787 F.Supp. 208, 211-12 n. 3 (Ct.Int'l Trade 1992).
 
 
 27
 In the administrative proceeding that led to the decision in Ad Hoc I, Commerce announced a change in its treatment of pre-sale home-market transportation expenses. The Department began deducting those expenses directly from foreign market value, without restricting the deductions to exporter's sales price transactions and without limiting the amount of the deductions to the amount permitted under the ESP offset cap. See Gray Portland Cement and Clinker from Mexico, 55 Fed.Reg. 29,245, at 29,251 (Dep't Comm.1990) (final determination). In so doing, Commerce did not rely on any statutory provision or regulation, but instead made the deductions under what Commerce has referred to as its "inherent power to fill in gaps in the antidumping statute." The Torrington Company (Dep't Comm. June 23, 1994) (final results); see also Tapered Roller Bearings From Japan, 56 Fed.Reg. 26,054, at 26,056 (Dep't Comm.1991) (final admin. review).
 
 
 28
 In Ad Hoc I, this court was presented with a challenge to Commerce's new practice of deducting pre-sale home-market transportation expenses from foreign market value in purchase price transactions. The court struck down the practice, holding that Commerce had acted beyond its power when it used its supposed "gap-filling authority" to deduct pre-sale home-market transportation expenses from foreign market value in that setting. 13 F.3d at 400, 403.
 
 
 29
 Following the decision in Ad Hoc I, Commerce once again modified its method of treating pre-sale home-market transportation expenses. Under its current approach, Commerce continues to rely on the statutory circumstances-of-sale provision to deduct direct home-market transportation expenses from foreign market value, regardless of whether United States price is calculated on the basis of purchase price or exporter's sales price. Indirect home-market transportation expenses are treated differently depending on whether United States price is derived from purchase price or exporter's sales price. If United States price is based on purchase price, Commerce does not deduct indirect home-market transportation expenses at all. If United States price is based on exporter's sales price, however, Commerce has reverted to its prior practice of characterizing indirect home-market transportation expenses as indirect selling expenses, which are deductible under the ESP offset up to the maximum allowed by the ESP offset cap. In addition, Commerce has modified somewhat the distinction it draws between direct and indirect transportation expenses. Where Commerce had previously defined all post-sale transportation expenses as direct and all pre-sale transportation expenses as indirect, Commerce has now adopted a more flexible test, under which expenses are treated as direct if they are related to a particular sale and indirect if they are not. Thus, even pre-sale transportation expenses may be considered direct if they are related to home-market sales of the particular goods in question.
 
 
 30
 Before the Court of International Trade, Torrington argued that Commerce's new practice violates Ad Hoc I. In particular, Torrington argued that Commerce could not avoid the impact of Ad Hoc I by treating it as limited to purchase price transactions and continuing to deduct pre-sale home-market expenses in cases in which United States price is based on exporter's sales price. The court disagreed; it concluded that Ad Hoc I addressed only purchase price transactions and that the court's holding was limited to rejecting Commerce's use of its supposed "gap-filling" authority to deduct pre-sale home-market transportation expenses from foreign market value when United States price was calculated on a purchase price basis.
 
 
 31
 In this court, Torrington continues to press its broad interpretation of Ad Hoc I. In Torrington's view, Ad Hoc I stands for the proposition that Commerce may not under any circumstances adjust foreign market value by deducting pre-sale home-market transportation expenses. While the court's opinion in Ad Hoc I contains language that could support a more general application, we do not agree that Ad Hoc I should be read as broadly as Torrington urges. In fact, Torrington's interpretation ignores language in Ad Hoc I that counsels in favor of reading that decision narrowly.
 
 
 32
 The court in Ad Hoc I described Commerce's traditional treatment of home-market transportation expenses. It specifically noted, without apparent disapproval, the Department's prior practice of deducting pre-sale home-market transportation expenses when United States price was based on exporter's sales price. The court then distinguished that practice from the new practice Commerce had adopted in that case:
 
 
 33
 Pre-sale transportation expenses [under prior practice] were treated as "indirect expenses," deductible from [foreign market value] only when [exporter's sales price] was used as the basis for the United States price.... In the case at bar, however, Commerce altered this practice and deducted pre-sale inland freight expenses while conducting a purchase price, rather than the exporter's sale price, comparison.
 
 
 34
 13 F.3d at 400-01. The court further noted that Commerce had not relied on the statutory circumstances-of-sale provision to support its newly devised adjustment to foreign market value; for that reason the court declined to rule on whether Commerce's actions might be justified under that provision. See id. at 400-01 & n. 8.
 
 
 35
 The court's references to the circumstances-of-sale provision and to Commerce's prior practice of treating pre-sale home-market transportation expenses as indirect selling expenses under the ESP offset support the government's view that Ad Hoc I was not intended to speak broadly to the question whether pre-sale transportation expenses can be deducted from foreign market value under any circumstances. In Ad Hoc I, Commerce deducted indirect expenses from foreign market value in the purchase price setting without invoking any express statutory or regulatory support. In this case, by contrast, Commerce relies on the ESP offset, a regulation that has been used for years to deduct indirect selling expenses (including pre-sale home-market transportation expenses) from foreign market value in exporter's sales price transactions. To extend Ad Hoc I to exporter's sales price transactions thus not only would ignore the limiting language in Ad Hoc I itself, but would overturn a longstanding administrative practice under the ESP offset regulation.
 
 
 36
 Extending Ad Hoc I to exporter's sales price transactions, as Torrington urges, would also bring that decision into tension with prior precedents of this court, in particular the decision in Smith-Corona. In that case, the court stated that "[i]n view of the discretion accorded the Secretary under the statute to make adjustments to foreign market value, we conclude that the exporter's sales price offset ... is a proper and reasonable exercise of the Secretary's authority to administer the statute fairly." 713 F.2d at 1579, 1 Fed.Cir. (T) at 141. To be sure, Smith-Corona did not explicitly endorse the application of the ESP offset to pre-sale home-market transportation expenses. Nonetheless, Commerce has broad authority to construe its own regulations, see Sharp Corp. v. United States, supra, 63 F.3d at 1094, and we think it entirely reasonable for Commerce to interpret the term "indirect selling expenses" in the ESP offset regulation to include indirect home-market transportation expenses. Moreover, in light of the "considerable deference" that this Court accords to Commerce's construction of the antidumping laws, see Daewoo Elecs. Co., supra, 6 F.3d at 1516, we accept Commerce's conclusion that nothing in the United States price section of the statute, 19 U.S.C. Sec. 1677a, prohibits the deduction of indirect home market transportation expenses from foreign market value under the ESP offset regulation. Because the ESP offset regulation is an authorized exercise of the discretion granted to the Secretary under the statutory circumstances-of-sale provision, see Smith-Corona, 713 F.2d at 1579, 1 Fed.Cir. (T) at 141; Brother Indus., Ltd. v. United States, 540 F.Supp. 1341, 1355-59 (Ct.Int'l Trade 1982), this is not a case in which, as in Ad Hoc I, Commerce can be said to have acted without statutory support to negate the impact of a specific provision of the United States price provision of the antidumping laws.
 
 
 37
 In sum, we conclude that this case is more akin to Smith-Corona than it is to Ad Hoc I. Under the rationale of Smith-Corona, Commerce may deduct indirect selling expenses, including indirect transportation expenses, from foreign market value under the ESP offset. The Court of International Trade therefore properly upheld Commerce's decision to deduct indirect home-market transportation expenses from foreign market value in cases in which United States price is calculated on the basis of exporter's sales price, to the extent allowable under the ESP offset cap.
 
 C
 
 38
 As noted, in its current treatment of transportation expenses Commerce has recharacterized the distinction between direct and indirect expenses. Rather than treating all post-sale transportation expenses as direct and all pre-sale transportation expenses as indirect, Commerce now looks to whether the expenses are directly related to particular home-market sales. As a result, some pre-sale transportation expenses are now regarded as direct and are deducted from foreign market value under the statutory circumstances-of-sale provision. Torrington contends that Ad Hoc I bars Commerce from characterizing pre-sale transportation expenses as direct and deducting them under the circumstances-of-sale provision, but our analysis of Ad Hoc I above leads us to reject that argument as well.
 
 
 39
 Nothing in the antidumping statute requires that Commerce rigidly classify post-sale expenses as direct and pre-sale expenses as indirect. In fact, the statute makes no reference to "direct" and "indirect" expenses at all, just as it makes no reference to "pre-sale" or "post-sale" expenses. In its regulations, Commerce uses the term "direct" selling expenses, or expenses "which bear a direct relationship to the sales compared," to describe those expenses that Commerce regards as directly deductible under the statutory circumstances-of-sale provision. See 19 C.F.R. Sec. 353.56(a)(1). Those "direct" expenses are distinguished in the regulations from indirect or "other" selling expenses that are deductible, if at all, only under other provisions, such as the ESP offset. We conclude that in refining the administrative definition of "direct" expenses, it was reasonable for Commerce to dispense with its prior, rigid distinction between pre-sale and post-sale expenses in favor of a more flexible rule that asks whether the expenses in question are directly related to a particular sale. Although Commerce explains that most pre-sale transportation expenses will continue to be characterized as indirect, pre-sale expenses will be deemed direct if they can be shown to relate to the particular sale under consideration. We therefore reject Torrington's challenge to Commerce's classification of certain pre-sale expenses as direct.
 
 
 40
 Because Torrington has not challenged the specific methodology that Commerce has chosen for determining whether particular pre-sale expenses are direct or indirect, we need not address whether that methodology, which calls for tying the characterization of transportation expenses to the characterization of the related warehousing expenses, is within Commerce's power to adopt. It is enough for present purposes to conclude that Commerce was not required to adhere to its former distinction between pre-sale and post-sale expenses for purposes of applying the circumstances-of-sale provision.
 
 
 41
 AFFIRMED.