# United States Court of Appeals
# for the Federal Circuit

---

**VICENTIN S.A.I.C., OLEAGINOSA MORENO HERMANOS S.A., MOLINOS AGRO S.A.,**
*Plaintiffs*

**LDC ARGENTINA S.A.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,**
*Defendants-Appellees*

---

2021-1988

---

Appeal from the United States Court of International Trade in Nos. 1:18-cv-00111-CRK, 1:18-cv-00119-CRK, Judge Claire R. Kelly.

---

Decided: August 2, 2022

---

GREGORY J. SPAK, White & Case LLP, Washington, DC, argued for plaintiff-appellant. Also represented by JESSICA LYND.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States.

Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM.

MYLES SAMUEL GETLAN, Cassidy Levy Kent USA LLP, Washington, DC, argued for defendant-appellee National Biodiesel Board Fair Trade Coalition. Also represented by THOMAS M. BELINE, CHASE DUNN, JACK ALAN LEVY, JAMES EDWARD RANSDELL, IV.

_____

Before MOORE, *Chief Judge*, TARANTO and HUGHES, *Circuit Judges*.

HUGHES, *Circuit Judge*.

This is an appeal from an antidumping investigation of biodiesel from Argentina. Appellant LDC Argentina S.A. challenges two calculations Commerce used to determine antidumping duties: export price and constructed value of the subject biodiesel.

Certain renewable fuels, such as the biodiesel at issue here, are entitled to tradeable tax credits. In calculating export price, Commerce subtracted the value of these tradeable credits, calling the credits "price adjustments" under 19 C.F.R. § 351.401(c). Because the credits fall within the regulatory definition of a "price adjustment" and substantial evidence supports the value Commerce used for the credits, we affirm Commerce's export price calculation.

Calculating constructed normal value of biodiesel in Argentina, Commerce used an international market price for soybeans, the primary input into biodiesel, because the price of soybeans in Argentina is subsidized. Commerce also addressed the same soybean subsidy through counter-vailing duties. LDC argues that correcting for the soybean subsidy in the export price creates an improper double remedy. But Commerce demonstrated with substantial

evidence that its constructed value calculation does not result in a double remedy. We affirm the constructed value.

BACKGROUND

The National Biodiesel Board Fair Trade Coalition and its members submitted an antidumping petition alleging that biodiesel from Argentina was sold at less-than-fair value into the United States. Commerce initiated an antidumping investigation and selected Vicentin S.A.I.C. and LDC Argentina S.A. as mandatory respondents. Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Biodiesel from Argentina at 3, 82 ITADOC 50391 (Oct. 19, 2017) (*Preliminary Results Memo*).

In an antidumping investigation, Commerce determines whether the subject merchandise was sold at less than fair value by subtracting the "export price," the price at which the subject merchandise was first sold to a purchaser in the United States, from the "normal value," which is the price of identical or similar merchandise sold outside the United States. 19 U.S.C. §§ 1677(35), 1677a(a), 1677b(a). The difference between the two is the dumping margin, and Commerce imposes antidumping duties in an amount equal to the dumping margin. 19 U.S.C. §§ 1673, 1677(35)(A). In this appeal, LDC challenges Commerce's determination of both the export price and the normal value.

I

The U.S. Environmental Protection Agency (EPA) incentivizes the use of renewable fuels by requiring certain entities, including United States gasoline and diesel fuel producers and importers, to meet an annual "renewable volume obligation." *Preliminary Results Memo* at 28–29. Entities show compliance with their renewable volume obligation by submitting to the EPA Renewable Identification Numbers (RINs) equaling the number of gallons in their

renewable volume obligations. *Id.* RINs are tradeable credits created by the importation and domestic production of renewable fuels. RINs are "attached" to biodiesel at the time of importation, and importers can later sell them as "detached" or "separated" RINs.

When calculating export price, 19 C.F.R. § 351.401(c) directs Commerce to "use a price that is net of price adjustments, as defined in section 351.102(b), that are reasonably attributable to the subject merchandise." Commerce considered the value of RINs generated by the importation of the subject biodiesel to be a "price adjustment" and so subtracted the value of the RINs from the export price. Final Results of Redetermination Pursuant to Ct. Remand at 1–2, 14–15 (*First Remand Results*), *Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) (No. 18-00111) (*Vicentin I*), ECF No. 79-1.[1] Commerce explained that the value of RINs is a "price adjustment" as defined in 19 C.F.R. § 351.102(b)(38) because "the invoice price does not reflect the true 'starting price' of biodiesel or 'price at which the *subject merchandise* is first sold' because it includes a RIN value." *Id.* at 10.

In support of its finding that the invoice price includes the value of RINs, Commerce cited a statement by LDC's U.S. affiliate that "the price of [biodiesel] is comprised of the cost of biodiesel . . . plus a RIN value" and that "buyers are cognizant of the value of RINs associated with a sale and likely factor [the value of RINs] in when negotiating a price." *Id.* at 12. Commerce also relied on an ITC report

---

[1]    At first, Commerce added the value of RINs to normal value. Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Argentina at 12, 83 ITADOC 8837 (Feb. 20, 2018) (*Final Results Memo*). On remand, it adjusted the export price instead. *First Remand Results* at 2.

showing that biodiesel with RINs attached costs much more than biodiesel without RINs. *Id.* at 11–12. So the RINs value "must be accounted for to arrive at the net price actually paid by the customer for the merchandise under investigation." *Id.* at 11.

For the value of RINs attached to the imported biodiesel, Commerce used the "daily spot prices" of separated RINs as reported by LDC and other parties. *Id.* at 38. Commerce relied on the statements of exporters in related ITC proceedings that "if a given RIN has a value of $0.75, it would *add* $0.75 to a gallon [of] biodiesel . . . [and] industry participants assume that a gallon of RINless [biodiesel] should be $0.75 per gallon less expensive than a gallon of [biodiesel] with . . . RINs attached." *Id.* at 13–14.

The Court of International Trade sustained Commerce's decision to subtract the value of RINs from export price. *Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227, 1233–37, 1239–42. (Ct. Int'l Trade 2020) (*Vicentin II*).

## II

Calculating the normal value of the subject biodiesel, Commerce determined that "domestic biodiesel sales prices are established by the [Argentinian] government and are not based on competitive market conditions." Issues and Decision Memorandum for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Argentina at 16, 83 ITADOC 8837 (Feb. 20, 2018) (*Final Results Memo*). Without a viable sales price in Argentina, Commerce based the normal value on a constructed value calculation pursuant to 19 U.S.C. § 1677b(a)(4). *Id.* Constructed value includes "the cost of materials . . . employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade." 19 U.S.C. § 1677b(e)(1). But under the recent Trade Preferences Extension Act of 2015, "if a particular market situation exists

such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," then Commerce "may use . . . any other calculation methodology" for the cost of materials. Trade Preferences Extension Act of 2015 § 504, 19 U.S.C. § 1677b(e).

Soybeans are the primary input into biodiesel. National Biodiesel argued "that Argentina levies high export taxes on feedstock, [including soybeans,] which has the effect of lowering the feedstock cost domestically." Appx11979 (internal quotation marks omitted). In a parallel countervailing duty investigation, Commerce found that the same export tax regime was a countervailable subsidy for sales of soybean-based products. Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Biodiesel from the Republic of Argentina at 13, 16–29, 82 ITADOC 53477 (Nov. 6, 2017).

In this antidumping investigation, National Biodiesel alleged that the soybean subsidy creates a particular market situation affecting respondents' reported costs of soybeans. Commerce agreed. Using "any other methodology" under 19 U.S.C. § 1677b(e), Commerce disregarded the respondents' actual reported soybean costs in favor of an international market price.

Respondents appealed Commerce's final antidumping determination to the Court of International Trade, arguing that Commerce could not reasonably adjust the cost of soybeans to account for the soybean subsidy because Commerce had offset the same program as a countervailable subsidy in the parallel investigation. *Vicentin I*, 404 F. Supp. 3d at 1334. The Court of International Trade twice remanded for Commerce to explain why it made the particular market situation adjustment for the soybean subsidy if the parallel countervailing duty investigation addressed the same program. *Id.* at 1340–43; *Vicentin II*, 466 F. Supp.

3d at 1242–45. Commerce maintained that it was not required to "measure or alleviate any double remedy" when relying on 19 U.S.C. § 1677b(e). Final Results of Redetermination Pursuant to Ct. Remand at 16, *Vicentin II*, 466 F. Supp. 3d. 1227 (No. 18-00111), ECF No. 108-1 (*Second Remand Results*).

Under protest, Commerce also determined that using the international soybean price did not create a double remedy. It borrowed the "pass-through" analysis from 19 U.S.C. § 1677f-1(f)(1), a provision meant to mitigate double remedies arising from parallel antidumping and countervailing duty proceedings in nonmarket economies. *Second Remand Results* at 9.

Commerce found that the effect of the soybean subsidy was not "passed through" to lower the biodiesel export price because the "record demonstrates overwhelmingly that the respondents price their U.S. sales by reference to U.S. market prices, either for conventional 'petro-diesel' or soybean oil." *Id.* at 10. LDC admitted that it "signed contracts with the customers, agreeing to provide B99 biodiesel that was *generally priced based on New York Mercantile Exchange (NYMEX) heating oil* futures prices plus some specified premium" when selling to U.S. companies. *Id.* Officials at Vicentin likewise "explained that the company may sell biodiesel at a flat price or based on a Chicago Board of Trade (CBOT) futures price, plus or minus a premium." *Id.* at 11. Documentary evidence of both respondents' sales confirmed this narrative. *Id.*

Commerce also cited an ITC finding that "biodiesel prices have been influenced by the price of petroleum-based diesel fuel, adjusted for government incentives supporting renewable fuels, *rather than biomass based diesel production costs.*" *Id.* (quoting Biodiesel from Argentina and Indonesia, Investigation Nos. 701-TA-571-572 and 731-TA-1347-1348 (Preliminary) at VI-7, U.S. ITC Publication 4690 (May 2017)). Commerce explained that the same ITC

report "demonstrates a lack of correspondence between the subsidy at issue and Argentine prices." *Id.* Argentinian biodiesel dropped in price from 2014 to 2015 and partially rebounded in 2016. *Id.* at 11–12. During the same period, the export tax on Argentinian soybeans fell. *Id.* at 12. But rather than increasing to reflect the changing subsidy, the price for Argentinian biodiesel followed the same pattern as the price of biodiesel from Canada and Indonesia, as well as overall United States prices. *Id.*

Having found that the soybean subsidy was not linked to the export price, Commerce concluded that its use of the international soybean prices did not lead to any double remedy, explaining that "as both sides of the [less-than-fair-value] equation in this instance are unaffected by the export tax on soybeans, the differential between U.S. prices and normal value (*i.e.*, the dumping margin) is not partially the result of the subsidy, and thus the [particular market situation] adjustment to fair value does not remedy the subsidy." *Id.*

The Court of International Trade affirmed Commerce's finding that the soybean subsidy is not passed through to export prices and affirmed Commerce's reasoning that the pass-through analysis showed that Commerce did not provide a double remedy. *Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1261–68 (Ct. Int'l Trade 2021) (*Vicentin III*). It thus permitted Commerce to rely on international soybean prices under the particular market situation provision of 19 U.S.C. § 1677b(e).

LDC appeals Commerce's treatment of RINs as a price adjustment and its use of international soybean prices to correct for the soybean subsidy. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## ANALYSIS

"We review a decision of the Court of International Trade evaluating an antidumping determination by

Commerce by reapplying the statutory standard of review . . . . We will uphold Commerce's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with the law." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014) (citation omitted); 19 U.S.C. § 1516a(b)(1)(B)(i).

I

LDC challenges Commerce's legal authority to subtract the value of RINs from the export price as a "price adjustment" under 19 C.F.R. § 351.401(c). LDC also argues that substantial evidence does not support Commerce's finding that it could use the value of separated RINs on the spot market as a proxy for the value of attached RINs.

A

Commerce's calculation accords with the statute. Commerce found that the invoice price does not reflect the "price at which the *subject merchandise* is first sold," as required by 19 U.S.C. § 1677a(a) "because [the invoice price] includes a RIN value." *First Remand Results* at 10. Further, as Commerce explained, subtracting the value of the RINs to isolate the price paid for biodiesel alone effects the overall statutory scheme for the less-than-fair-value comparison, which "seeks to produce a fair 'apples-to-apples' comparison between" the normal value and export price. *Id.* at 4 (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).

LDC argues that Commerce's treatment of the RINs conflicts with the statute. LDC relies on our holding in *AK Steel Corp. v. United States* defining "sold" under 19 U.S.C. § 1677a(a)–(b) "to require both a 'transfer of ownership to an unrelated party and consideration.'" *AK Steel Corp. v. United States*, 226 F.3d 1361, 1371 (Fed. Cir. 2000) (quoting *NSK Ltd. v. United States*, 115 F.3d 965, 975 (Fed. Cir. 1997)). LDC contends that these attributes of a sale "indicate that the 'first sold' price is a price that was discussed

and agreed upon between the parties to the sale." Appellant's Br. 25. But transfer of ownership and consideration show whether and between whom a sale has occurred. *See AK Steel*, 226 F.3d at 1371 (relying on the definition for this purpose). The definition in *AK Steel* does not bear on the price for that sale.

Turning to the language of the regulation, 19 C.F.R. § 351.401(c) provides: "In calculating export price, . . . the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise . . . ." Section 351.102(b)(38) defines "price adjustment" as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale . . . , that is reflected in the purchaser's net outlay." The two phrases "such as" and "or other adjustment" convey that the definition is not limited to discounts and rebates. *See also* Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,644 (Mar. 24, 2016) (amending the definition "to clarify that a price adjustment is not just limited to discounts or rebates, but encompasses other adjustments as well"). Overall, the regulations direct Commerce to use the purchaser's "net outlay," or "net price actually paid" for the subject merchandise, rather than any invoice price that does not account for discounts, rebates, and other adjustments. *See* 19 C.F.R. § 351.102(b)(38); Antidumping Duties; Countervailing Duties; 62 Fed. Reg. 27,296, 27,344 (May 19, 1997) ("[P]rice adjustments include such things as discounts and rebates that do not constitute part of the net price actually paid by a customer.").

LDC contends that the regulation requires "(1) a starting price actually paid by a customer and (2) an adjusted price agreed between the buyer and seller." Appellant's Br. 33. We see no requirement that an unadjusted starting

price be a price "actually paid." To the contrary, a discount applied before payment is still a discount. We also see no requirement that the buyer and seller expressly state or negotiate an adjusted price. The example of a manufacturer's rebate is illustrative. A manufacturer could sell its product to an importer through a distributor and pay a rebate directly to the importer. There would be no need for the distributor and importer to agree on what the price would have been without the rebate. Because rebates are a type of "price adjustment" contemplated by 19 C.F.R. § 351.02(b)(38), Commerce would subtract the value of the manufacturer's rebate and use for its export price the importer's "net outlay" after the rebate. RINs from the sale of biodiesel into the United States are similar. The importer receives a fungible credit affecting its "net outlay" for the biodiesel, and the importer and exporter do not expressly negotiate what the price would have been without the credit. Given the similarities between RINs and rebates, the non-limiting language of the regulation, and the fact that Commerce's calculation effects the overall statutory scheme, the regulation unambiguously permits Commerce to subtract the RINs values.[2]

---

[2] LDC contends that Commerce's broad interpretation of 19 C.F.R. §§ 351.401(c) and 351.102(b)(38) departs from its "longstanding interpretation of 'price adjustment'" that the adjustment be "one that actually existed in the transaction as agreed upon between the parties and changed the price from a starting price to an adjusted price." Appellant's Br. 35. Commerce's interpretation creates "unfair surprise," LDC argues, and thus we should not defer to it. Appellant's Br. 34–35 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019)). Because we hold that the regulation unambiguously permits Commerce to subtract the RINs values, we do not reach this argument regarding

We agree with Commerce that 19 C.F.R. §§ 351.401(c) and 351.102(b)(38) allow it to subtract the value of RINs from export price as a "price adjustment."

B

LDC next argues that the value Commerce used for the RINs is not supported by substantial evidence because Commerce used "the value of separated-RINs, which are different from attached-RINs or the RINs-eligibility of biodiesel" and "none of the RIN values used in the price adjustment were actually connected to those individual transactions that make up the record." Appellant's Br. 37. In other words, "[t]here is no record evidence that the buyer in LDC's actual transactions investigated by Commerce assigned the same value to the RIN-generating value of LDC's biodiesel as a buyer that needed RINs would pay for separated-RINs on the spot market." *Id.* at 38.

But Commerce did cite evidence that the value of separated RINs on the spot market is an accurate estimate of the value of attached RINs. Commerce cited the statements of exporters in related ITC proceedings that "if a given RIN

---

deference. In any event, Commerce previously indicated that it believes the regulation to be broad and non-limiting. *E.g.*, Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. at 15,644. LDC offers scant support for its contrary characterization of Commerce's "longstanding interpretation." It provides examples and cases relating to Commerce's "practice . . . to add circumstances of sale adjustment in the U.S. market to constructed value or to deduct them from constructed export price," as an alternative to using the price adjustment regulations. Appellant's Br. 29–31. But these authorities do not show any prior conflicting interpretation of the price adjustment regulation Commerce relied on here.

has a value of $0.75, it would *add* $0.75 to a gallon [of] bi-odiesel . . . [and] industry participants assume that a gal-lon of RINless [biodiesel] should be $0.75 per gallon less expensive than a gallon of [biodiesel] with . . . RINs at-tached." *First Remand Results* at 13–14. This statement, which LDC does not acknowledge in its briefing, provides substantial evidence to support Commerce's use of the sep-arated RINs price.

## II

Turning to Commerce's constructed normal value cal-culation, LDC challenges Commerce's interpretation of the particular market situation provision of 19 U.S.C. § 1677b(e). LDC argues that Commerce unreasonably in-terpreted the provision to "permit[] it to adjust allegedly distortive production costs when Commerce has already imposed a countervailing duty." Appellant's Br. 40. LDC argues that this interpretation is unreasonable because it creates a double remedy. Commerce argues that its reli-ance on 19 U.S.C. § 1677b(e) here is lawful because it found that the soybean subsidy is not passed through to the ex-port price and therefore Commerce correcting for the soy-bean subsidy in the constructed value calculation did not create any double remedy. LDC responds that this finding is unsupported by substantial evidence.

## A

The antidumping and countervailing duty laws remedy different practices. The countervailing duty statute broadly addresses market distortions caused by foreign government subsidization, while the antidumping statute focuses on whether a domestic industry is being injured by foreign producers or exporters selling imported merchan-dise at "less than its fair value." *Compare* 19 U.S.C. § 1671(a), *with* 19 U.S.C. § 1673(1).

To avoid antidumping duties, exporters must sell their merchandise at or above the "fair value," which is the

normal value as defined in 19 U.S.C. § 1677b. The normal value is the price for merchandise identical or similar to the subject merchandise and sold outside the United States. 19 U.S.C. §§ 1677b(a)(1), 1677(16). Critically, the normal value is the price "in the ordinary course of trade." 19 U.S.C. §§ 1677b(a)(1)(B)(i), (a)(1)(C)(iii), (b)(1), (f)(2), 1677(15)(A)–(C) (requiring Commerce to disregard sales outside the ordinary course of trade). And if Commerce cannot determine the normal value using prices in the exporting country, Commerce may approximate the normal value with a "constructed" normal value. 19 U.S.C. § 1677b(a)(4). Commerce calculates the constructed value under 19 U.S.C. § 1677b(e) by summing the costs of production and selling, general and administrative expenses, and profits.

A particular market situation that reduces a respondent's costs below the costs in the ordinary course of trade tends to make Commerce's calculation of the constructed normal value an underestimate of the normal value in the ordinary course of trade. This underestimate is an issue if a respondent does not pass its reduced costs through as reduced prices of the exported merchandise. Under these circumstances, the particular market situation would decrease the constructed normal value but not the export price. If Commerce used the underestimated constructed normal value, then the dumping margin would shrink, and Commerce would not remedy dumping to the full extent permitted by the antidumping laws.

The particular market situation provision of 19 U.S.C. § 1677b(e) authorizes Commerce to correct such a distortion. If Commerce finds a particular market situation that reduces a respondent's cost of an input below the cost in the ordinary course of trade, then Commerce may use a different measure of the cost. If the respondent does not pass the reduced cost through to the price of its exported merchandise, then Commerce may instead use the cost as it would be in the ordinary course of trade, i.e., as it would be without the particular market situation. The result is a

constructed value that is an appropriate estimate of the normal value and that can be fairly compared with the export price without the particular market situation impacting either value. Making this correction allows Commerce to remedy dumping to the full extent of the law.

That is exactly what Commerce did here. Commerce found a particular market situation that reduced LDC's soybean costs.[3] Finding that LDC had not passed the reduced soybean price through to the price of biodiesel exported to the United States, Commerce chose to adjust the constructed value upward to match the value in the ordinary course of trade, using the clear statutory authority of 19 U.S.C. § 1677b(e). As a result of its particular market situation adjustment, Commerce arrived at a constructed value that approximates normal value based on sales of biodiesel in the ordinary course of trade. And use of this constructed value resulted in an adequate remedy for dumping, which is not duplicative of the countervailing duty remedy.

Framed another way, Commerce has relied on an international market price for soybeans in place of the Argentinian cost. Because of this adjustment, the soybean subsidy did not affect the constructed normal value of biodiesel. Commerce found that the respondents did not pass the soybean subsidy through to biodiesel exported to the United States, and therefore the subsidy did not affect the export price of biodiesel either. These two facts support Commerce's inference that "no portion of the [less-than-fair-value] differential can be attributed to the subsidy,"

---

[3]   LDC does not challenge the notion that an export tax that reduces the price of an input may be a "particular market situation" in general, only that Commerce should not correct for such a regime under 19 U.S.C. § 1677b(e) if Commerce has imposed countervailing duties to address the regime.

*Second Remand Results* at 9, and therefore, the antidumping duty did not provide a remedy duplicative of the countervailing duty.

B

Commerce found that the respondents did not pass the soybean subsidy through to the export price because exporters do not set the biodiesel price based on the cost of soybeans. LDC argues that Commerce departed from its usual practice in nonmarket economy investigations of collecting direct evidence of a subsidies-to-cost link and cost-to-price link through a questionnaire it sends to producers and exporters, and that as a result its finding is unsupported by substantial evidence. Even assuming LDC exhausted administrative remedies for this challenge, Commerce's method of gathering information does not alone undermine the substantiality of the evidence supporting its conclusion. Although a questionnaire might be the easiest way for Commerce to gather the evidence required, other methods and sources of evidence are not prohibited. *See Wheatland Tube Co. v. United States*, 26 F. Supp. 3d 1372, 1385 (Ct. Int'l Trade 2014). Commerce cited evidence that biodiesel export prices are set based on international prices for heating oil with a fixed premium, rather than based on volatile feedstock costs, and that the price of Argentinian biodiesel tracked prices from other countries rather than responding to changes in the Argentinian subsidy. This amounts to substantial evidence that "there is no significant link between the subsidy and U.S. prices." *Second Remand Results* at 12.

We affirm Commerce's finding that there is no risk of double counting in this case. We therefore need not address LDC's argument that the statute does not allow Commerce to make an adjustment that results in a double remedy or that creates a risk of a double remedy.

*    *    *

For these reasons, the judgment of the Court of International Trade is

**AFFIRMED**