Slip Op. 26-69

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ELLWOOD CITY FORGE CO.,<br>ELLWOOD NATIONAL STEEL CO.,<br>ELLWOOD QUALITY STEELS CO.,<br>AND A. FINKL & SONS,<br><br>      Plaintiffs/Defendant-Intervenors,<br><br>      v.<br><br>UNITED STATES,<br><br>      Defendant.<br><br>BGH EDELSTAHL SIEGEN GMBH,,<br><br>      Defendant-Intervenor/Plaintiff. | **Before: Timothy M. Reif, Judge**<br><br>**Consol. Court No. 21-00077** |

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's remand redetermination in the administrative review of the antidumping order on Fluid End Blocks from Germany.]

Dated: June 29, 2026

James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for plaintiffs and defendant-intervenors Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons. Also on the brief were Myles S. Getlan, Thomas M. Beline and Nicole Brunda.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. Also on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Franklin E. White, Jr., Assistant Director, and Kara M. Westercamp, Trial Attorney. Of counsel was Alexander Fried, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Marc E. Montalbine, deKieffer & Horgan, PLLC, of Washington, D.C., argued for plaintiffs and defendant-intervenors BGH Edelstahl Siegen GmbH. Also on the brief

were J. Kevin Horgan, Gregory S. Menegaz, Alexandra H. Salzman and Merisa A. Horgan.

*          *          *

Reif, Judge:  This action is a challenge to the *Final Determination* and *Second Remand Redetermination* of the U.S. Department of Commerce ("Commerce") in its less-than-fair-value investigation into forged steel fluid end blocks ("FEBs") from the Federal Republic of Germany ("Germany").  *See Forged Steel Fluid End Blocks from the Federal Republic of Germany* ("*Final Determination*"), 85 Fed. Reg. 80,018 (Dep't of Commerce Dec. 11, 2020) and accompanying Issues and Decision Memorandum ("IDM"); *Final Results of Redetermination Pursuant to Ct. Remand*, ECF No. 80-1 ("*Second Remand Redetermination*").

In *Ellwood City Forge Co. v. United States* ("*Ellwood I*"), 46 CIT __, __, 600 F. Supp. 3d 1281 (2022), the Court remanded Commerce's *Final Determination* for reconsideration of its particular market situation ("PMS") adjustments to the dumping margin calculation for BGH Edelstahl Siegen GmbH ("BGH").  *Id.* at 1308.

In *Ellwood City Forge Co. v. United States* ("*Ellwood II*"), Slip Op. 23-110, 2023 WL 4703309 (CIT July 24, 2023), the Court: (1) granted Commerce's request for a remand to examine errors alleged by Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co. and A. Finkl & Sons (collectively, "Ellwood"); and (2) ordered Commerce to provide an adequate explanation for its decision on Ellwood's request that Commerce employ alternative pathways to a PMS adjustment.  *Id.* at *6.

BGH requests that the court reject Commerce's PMS adjustments for subsidized electricity rates and imported inputs of ferrochrome on the grounds that Commerce's findings are not supported by substantial evidence and are otherwise not in accordance

with law.  BGH Edelstahl Siegen GMBH Cmts. on Second Remand Redetermination ("BGH Cmts.") at 6-22, ECF No. 85.

Ellwood moves the court to: (1) reject Commerce's construction of 19 U.S.C. § 1677b(f)(1)(A) in the agency's *Second Remand Redetermination* as contrary to law and unsupported by substantial evidence; and (2) remand the *Second Remand Redetermination* to the agency to reconsider the § 1677b(f)(1)(A) pathway for adjusting the agency's antidumping calculations.  Pls. Cmts. in Opp'n to the Final Results of Commerce's Second Redetermination Pursuant to Ct. Remand ("Pls. Cmts.") at 1-2, 26, ECF No. 83.

For the reasons discussed below, the court sustains in part and remands in part Commerce's *Second Remand Redetermination*.

## BACKGROUND

### I.    Administrative Record

The court presumes familiarity with the FEBs at issue as detailed in *Ellwood I*.[1]

---

[1] The International Trade Administration describes the types of FEBs considered within the scope of Commerce's less-than-fair-value investigation as follows:

The products covered by this investigation are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.
The term "forged" is an industry term used to describe the grain texture of steel resulting from the application of localized compressive force. Illustrative forging standards include, but are not limited to, American Society for Testing and Materials (ASTM) specifications A668 and A788 . . . . The products covered by this investigation are: (1) Cut-to-length fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) of 11 inches (279.4 mm) to 75 inches (1,905.0 mm); and (2) strings of fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2

BGH is a German manufacturer of FEBs for import into the United States and a mandatory respondent in Commerce's less-than-fair-value investigation at issue in the instant action.  *Ellwood I*, 46 CIT at __, 600 F. Supp. 3d at 1287 (citing Compl., ECF No. 6).  Ellwood is a domestic producer of a like product.  Compl. ¶ 2.  On December 19, 2019, Ellwood filed a petition with Commerce alleging that German exporters sold FEBs in the United States at less-than-fair value.  *Forged Steel Fluid End Blocks from the Federal Republic of Germany, India, and Italy*, 85 Fed. Reg. 2394 (Dep't of Commerce Jan. 15, 2020) (initiation of antidumping duty investigation).

On December 11, 2020, Commerce published its *Final Determination*, assigning BGH a dumping margin of 3.82 percent.  *Final Determination*, 85 Fed. Reg. at 80,019.

On February 26, 2021, Ellwood challenged Commerce's *Final Determination* regarding BGH.  Compl. ¶¶ 23-39.  On March 30, 2021, the Court granted BGH's motion to intervene as defendant-intervenor.  Order Granting BGH's Mot. to Intervene, ECF No. 14.

---

mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) up to 360 inches (9,144.0 mm) . . . .
A fluid end block may be imported in finished condition (i.e., ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (i.e., forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly). Such finishing operations may include: (1) Heat treating; (2) milling one or more flat surfaces; (3) contour machining to custom shapes or dimensions; (4) drilling or boring holes; (5) threading holes; and/or (6) painting, varnishing, or coating.

*Ellwood City Forge Co. v. United States ("Ellwood I")*, 46 CIT __, __, 600 F. Supp. 3d 1281, 1287-88 (2022) (quoting *Forged Steel Fluid End Blocks from the Federal Republic of Germany, India, and Italy*, 85 Fed. Reg. 2394, 2399 (Dep't of Commerce Jan. 15, 2020) (initiation of antidumping duty investigation)).

On May 7, 2021, the Court granted Ellwood's consent motion to consolidate the instant case with a companion case in which BGH challenged similar aspects of the *Final Determination* under consideration here. Order Granting Mot. to Consolidate Cases, ECF No. 18. The Court designated the instant case as the lead case. *Id.*

## II. *Ellwood I*

In August 2021, Ellwood and BGH filed separate Rule 56.2 motions for judgment on the agency record. Pls. Rule 56.2 Mot. for J. on the Agency R., ECF No. 26; BGH Mot. for J. Upon the Agency R. ("BGH Rule 56.2 Mot."), ECF No. 27.

Ellwood asked this Court to remand Commerce's *Final Determination* on the bases that: (1) the agency's failure to conduct on-site verification was contrary to law; and (2) the agency's *Final Determination* was unsupported by substantial evidence and contrary to law because it relied on unreconciled cost data. Pls. Br. in Support of Mot. for J. on the Agency R. at 17-36, ECF No. 26-1.

BGH asked the Court to remand Commerce's *Final Determination* on the grounds that: (1) Commerce erred in making PMS adjustments to BGH's reported costs; and (2) Commerce erred in its application of differential pricing methodology. BGH Rule 56.2 Mot. at 5-22.

Following oral argument in April, the Court issued its opinion in *Ellwood I* on November 8, 2022. 46 CIT at __, 600 F. Supp. 3d at 1287. The Court held that Ellwood had forfeited its verification claim and that Commerce did not err in its pricing methodology. *Id.* at 1308. The Court remanded the *Final Determination* to Commerce to remove its PMS adjustment in accordance with the decision of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") in *Hyundai Steel Co. v. United States*,

19 F.4th 1346 (Fed. Cir. 2021).  *Id.* at 1302-03.  In *Hyundai Steel*, the Federal Circuit

upheld the CIT's longstanding position that application of PMS adjustments in

calculating the cost of production for sales below cost is inconsistent with 19 U.S.C. §

1677b(b). [2]  *Hyundai Steel*, 19 F.4th at 1352-55.

On this basis, the Court remanded "to allow Commerce to recalculate the

dumping margin without impermissible cost-based [PMS] adjustments."  *Ellwood I*, 600

F. Supp. 3d at 1303.

### III.    *Ellwood II*

On March 14, 2023, Commerce filed its *First Remand Redetermination* with the

Court, removing the PMS adjustment to BGH's antidumping margin and providing BGH

with a new dumping margin of zero*.  Final Results of Redetermination Pursuant to Ct.*

*Remand* ("*First Remand Redetermination*") at 4, ECF No. 59-1.

---

[2] (b) SALES AT LESS THAN COST OF PRODUCTION . . ., (3) CALCULATION OF COST OF
PRODUCTION. For purposes of this part, the cost of production shall be an amount
equal to the sum of—

(A) the cost of materials and of fabrication or other processing of any kind
employed in producing the foreign like product, during a period which would
ordinarily permit the production of that foreign like product in the ordinary course
of business;

(B) an amount for selling, general, and administrative expenses based on actual
data pertaining to production and sales of the foreign like product by the exporter
in question; and

(C) the cost of all containers and coverings of whatever nature, and all other
expenses incidental to placing the foreign like product in condition packed ready
for shipment.

19 U.S.C. § 1677b(b) (citation modified).

In its *First Remand Redetermination*, Commerce responded to comments made by Ellwood arguing that Commerce improperly ignored alternative avenues to making its PMS adjustment to BGH's production costs.  *Id.* at 6.  Commerce stated that "this remand redetermination is not the appropriate proceeding in which Commerce should address, for the first time, alternative possible interpretations of the [Federal Circuit's] analysis in *Hyundai Steel*."  *Id.*

On April 13, 2023, Ellwood filed comments opposing Commerce's *First Remand Redetermination*, arguing that Commerce's revision to the margin calculation: (1) contained an error[3] that distorted BGH's dumping margin; and (2) was contrary to law on the grounds that Commerce refused to consider alternative pathways to adjust BGH's production costs.  Pls. Cmts. in Opp'n to the Final Results of Redetermination Pursuant to Ct. Remand at 2-17 ("Pls. Cmts. on First Remand Results"), ECF No. 63. In response, defendant argued that Commerce was barred from considering alternative pathways and requested voluntary remand to review the alleged error.  Def. Resp. to Pls. Cmts. on the Remand Redetermination and Req. for Partial Voluntary Remand at 4-8, ECF No. 65.

---

[3] In the *Ellwood City Forge, Co. v. United States* ("*Ellwood II*"), Slip Op. 23-110, 2023 WL 4703309 (CIT July 24, 2023) proceedings, Ellwood alleged that when Commerce removed the PMS adjustment, Commerce failed to remove that adjustment from the denominator of the equation used to determine the variable cost difference, "a filtering mechanism [used] to determine whether a given . . . product sold in the U.S. market can reasonably be compared with the closest, non-identical . . . product sold in the home market."  Pls. Cmts. in Opp'n to the Final Results of Remand Redetermination Pursuant to Ct. Remand at 2, ECF No. 63.

On July 24, 2023, the Court published *Ellwood II*, which: (1) granted Commerce's request for voluntary remand;[4] and (2) ordered Commerce to "consider the arguments made and state a fulsome rationale for either considering or not considering [p]laintiffs' alternative pathways." *Ellwood II,* 2023 WL 4703309 at *3, *6 (citing *Bonney Forge Corp. v. United States*, 46 CIT __, __, 560 F. Supp. 3d 1303, 1312 (2022) ("The Court reviews answers Commerce actually gave for substantial evidentiary support. It does not draft answers Commerce never gave from the available record information before the Department.")).

**IV**.     ***Second Remand Redetermination***

On November 21, 2023, Commerce filed its *Second Remand Redetermination* with the Court, correcting the mathematical error alleged by Ellwood and providing BGH with a new antidumping margin of 3.08 percent. *Second Remand Redetermination* at 19. The agency addressed also Ellwood's arguments regarding alternative pathways for a PMS and explained the reasons that such pathways were not permissible. *Id.* at 4-8.

On December 21, 2023, Ellwood filed comments in opposition to the *Second Remand Redetermination*, arguing that Commerce's construction of 19 U.S.C. § 1677b(f)(1)(A)[5] is contrary to law. Pls. Cmts. at 1-2. Ellwood alleged also that

---

[4] Pursuant to Federal Circuit precedent in *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001), Commerce is not considered to have confessed error in requesting remand to reconsider its previous position. *See Ellwood II,* 2023 WL 4703309 at *3; *see also Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C. Cir. 1993).

[5] (f) SPECIAL RULES FOR CALCULATION OF COST OF PRODUCTION AND FOR CALCULATION OF CONSTRUCTED VALUE . . . . (1)COSTS

Commerce's determination that "BGH's records 'reasonably reflect' production costs" was arbitrary and unsupported by substantial evidence.  *Id.*

On January 5, 2024, defendant filed a response, rejecting Ellwood's arguments and requesting that the Court sustain Commerce's *Second Remand Redetermination* and enter final judgment in favor of the United States.  Def. Resp. to Pls. Cmts. on Remand Redetermination at 10, ECF No. 84.

On January 22, 2024, BGH filed comments on the *Second Remand Redetermination*: (1) supporting Commerce's response to Ellwood's arguments regarding the agency's construction of § 1677b(f)(1)(A); and (2) arguing that Commerce's PMS adjustments related to electricity and ferrochrome are not supported by substantial evidence on the administrative record.  *See* BGH Cmts.

On July 7, 2025, pursuant to 28 U.S.C. § 253(c) and CIT Rule 77(e)(4), the instant action was reassigned.  *Ord. of Reassignment, ECF No. 115.*

**JURISDICTION AND STANDARD OF REVIEW**

This court exercises jurisdiction over the instant action under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c).

---

(A) IN GENERAL. Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f).

On remand, the Court will sustain a determination by Commerce if the determination is "in accordance with the remand order [is] supported by substantial evidence, and [is] otherwise in accordance with law." *Maclean-Fogg Co. v. United States,* 39 CIT __, __, 100 F. Supp. 3d 1349, 1355 (2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also Prime Time Com. LLC v. United States*, 45 CIT __, __, 495 F. Supp. 3d 1308, 1313 (2021) ("The court will uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]'" (quoting 19 U.S.C. § 1516a(b)(1)(B)(i))).

The "substantial evidence" standard requires "more than a mere scintilla" of evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)), "but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). The standard requires that Commerce provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).

In reviewing Commerce's determination, the Court assesses whether the agency's action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citing

*Burlington Truck Lines*, 371 U.S. at 168; *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)).

## DISCUSSION

I.    **Whether Commerce's finding of market distortions is supported by substantial evidence**

A.    **Legal framework**

19 U.S.C. § 1677b(b)(1) provides that certain sales made outside "the ordinary

course of trade" may be excluded from the calculation of normal value.  The statute

defines "ordinary course of trade" to exclude specifically sales below cost and situations

in which a PMS does not allow for a proper comparison between normal value and

export price or constructed export price.  § 1677(15)(A), (C).  Commerce may disregard

sales made outside of the "ordinary course of trade" and instead rely on constructed

value ("CV") under § 1677b(e).  § 1677b(a)(4).  A PMS under § 1677(15) involves

distortions in sales prices, which thereby affects whether Commerce may rely on home-

market sales data for normal-value comparisons.  This type of distortion is also referred

to as a sales-based PMS.  *See, e.g.*, *Saha Thai Steel Pipe Public Co. v. United States*

("*Saha Thai I*"), 43 CIT __, __, 422 F. Supp. 3d 1363, 1370 (2019) ("Section 504(a)

amended 19 U.S.C. § 1677(15), allowing Commerce to consider certain sales and

transactions . . . to be outside the ordinary course of trade when a particular market

situation prevents a proper comparison with the export price or constructed export

price.") (internal quotation marks omitted).

A *cost-based* PMS, by contrast, refers to distortions in production costs—such as

manipulated input or energy prices—addressed under § 1677b(e), which governs how

Commerce constructs value.  *See, e.g.*, *Id*.  Under that provision, a cost-based PMS

exists when the "cost of materials and fabrication or other processing of any kind" deviates from the typical cost of production "in the ordinary course of trade," and Commerce finds it more likely than not that this distortion affected the cost of production ("COP") of the subject merchandise.   § 1677b(e)(3).

The 2015 Trade Preferences Extension Act ("TPEA") amendment to § 1677b(e) authorizes Commerce to employ "another calculation methodology" when a PMS renders reported costs unreliable.  Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 385.  However, that authority applies only in the constructed-value context.  When drafting the TPEA, "Congress did not leave a gap for Commerce to fill with regard to adjusting the costs of production.  Rather, Congress simply and unambiguously allowed for a PMS adjustment to constructed value but not to the costs of production for purposes of the sales-below-cost test."  *Hyundai Steel*, 19 F.4th at 1354.

The statute does not define "particular market situation" other than to require a showing that either the sales made, or the production costs incurred, are outside the "ordinary course of trade."  §§ 1677b(b), (e).  The Federal Circuit has stated that "the circumstances supporting a 'particular' market situation also must be 'particular' to producers of the subject merchandise during the relevant period."  *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (citing *SeAH Steel Corp. v. United States*, 45 CIT __, __, 513 F. Supp. 3d 1367, 1393 (2021)).

The Court noted that "in addition to finding unique market phenomena, Commerce must demonstrate that those market phenomena prevent the cost of materials and fabrication from accurately reflecting the cost of production," adding

"Commerce must therefore identify what unique facts render the cost of materials and fabrication an inaccurate reflection of the cost of production in the ordinary course of trade." *Garg Tube Exp. LLP v. United States*, 46 CIT __, __, 569 F. Supp. 3d 1202, 1211 (2022).

Accordingly, to sustain a PMS determination under § 1677b(e), Commerce must identify evidence on the record of a particular market situation that distorts production costs such that the costs fall outside the ordinary course of trade and Commerce must reasonably explain, supported by substantial evidence, how that distortion affects the production costs of the producers under review. *See NEXTEEL*, 28 F.4th at 1234.

## B.    Electricity

### 1.    Whether Commerce's findings of distortions in electricity pricing are supported by substantial evidence

The court concludes that Commerce's determination that the German electricity market is distorted is supported by substantial evidence.

BGH argues that "no significant market distortions exist with respect to the German electricity market," adding that "[t]here is no evidence that there is government control over pricing . . . to such an extent that home market prices cannot be considered to be competitively set." BGH Cmts. at 10.

BGH advances three main arguments. First, BGH argues that electricity in Germany is "produced, sold, and distributed by a network of private companies." *Id.* Commerce explained that the presence of private actors does not preclude a finding of distortion where the government intervenes in pricing. IDM at 20. Instead, Commerce found that "the [German] regulatory regime distorts the costs of electricity in the German market such that a PMS exists. In addition to the government control over pricing for a

portion of the electricity market alleged by the petitioner, this regulatory scheme is manifested in several electricity-related subsidy programs."  *Id.*  Commerce concluded that these price-setting and subsidization programs, considered collectively, demonstrated substantial government efforts to control electricity pricing such that market prices are not competitively set.  *See id.*

The court agrees, as this Court has held previously, that the statute permits a PMS determination where there is government intervention in the market through price-setting or subsidy programs.  *See, e.g., Wilmar Trading Pte Ltd. v. United States*, 46 CIT __, __, 582 F. Supp. 3d 1243, 1256 (2022) (upholding a PMS finding based on the extent of the Indonesian government's control over biodiesel, rather than the number of programs, where that control rendered prices non-competitive and outside the ordinary course of trade).  Congress expressly identified "government control over pricing to such an extent that home market prices cannot be considered to be competitively set" as an example of a PMS.  *See* Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, vol. 1, at 82 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162.  Further, the Federal Circuit observed in *NEXTEEL* that "[g]overnment control of electricity prices is a type of distortion expressly contemplated by Congress."  28 F.4th at 1237.  The court accordingly holds that Commerce's basis for finding that the German electricity market is distorted due to government intervention is in accordance with law.

BGH's second argument is that there can be no PMS with respect to electricity costs in Germany because those costs are "far above" electricity costs in the United States even after accounting for German government reductions.  BGH Cmts. at 10-12.

Defendant argues that BGH's comparison is misplaced.  *See* Def. Sur-Reply to Consol. Pls. Cmts. on Commerce's Remand Redetermination at 7 ("Def. Sur-Reply"), ECF No. 90 (finding BGH's second argument "meritless" and explaining that, even if German electricity prices are higher relative to other countries, that comparison does not disturb Commerce's conclusion—based on record evidence—that electricity prices in Germany are outside the ordinary course of trade (citing IDM at 20-22)).  In the IDM, Commerce explained further that "where a PMS exists such that the price of certain input materials does not accurately reflect the cost of manufacture, it is within Commerce's discretion to use another calculation methodology to calculate [a normal value] that reflects production costs in the ordinary course of trade."  IDM at 21.

The court concludes that a PMS finding is not precluded under these circumstances merely because German electricity prices are higher than electricity prices in the United States.  The SAA explains that cross-country comparisons may be informative but are not dispositive.  *See* 1994 U.S.C.C.A.N. at 4162 (noting that "a particular market situation could arise from differing patterns of demand in the United States and in the foreign market," for example where "significant price changes are closely correlated with holidays which occur at different times of the year in the two markets.").  By acknowledging that differing patterns across markets may indicate the existence of a PMS, Congress made clear that a cross-country price comparison alone is not determinative of whether a PMS exists.

As noted, a PMS finding requires that Commerce: (1) show that the sales made, or the costs incurred, are outside the ordinary course of trade; and (2) explain how the circumstances supporting a "particular" market situation affect the producers of the

subject merchandise during the relevant period. *NEXTEEL*, 28 F.4th at 1234; §

1677b(e); § 1677b(b). With respect to the first requirement, the court holds that

Commerce's finding that Germany's electricity market is distorted by government

intervention is supported by substantial evidence and in accordance with law.

Commerce reasonably relied on record evidence showing that multiple government

programs collectively influenced electricity pricing. The court addresses the second

requirement—particularity—and BGH's third argument below.

> **2.     Whether distortions in German electricity prices are 'particular'**

The court is unable to determine whether substantial evidence supports

Commerce's finding that distortions in the German electricity market satisfy the

particularity requirement for a PMS determination, or whether that finding is in

accordance with law. BGH argues that "none of the electricity taxes or surcharges

treated by Commerce as a PMS are [sic] particular to producers of fluid end blocks or

even steel products in general."[6] BGH Post-Oral Arg. Br. at 7, ECF No. 106. The

electricity taxes or surcharges to which BGH refers include: "Sections 9a, 9b and 10 of

the Electricity Tax Act, Sections 51, 54 and 55 of the Energy Tax Act, the EEG Special

Equalization Scheme and Concession Fee Ordinance Relief." *Id.* at 6.

---

[6] Commerce's PMS finding is made in regard to four German programs: the Stromsteuergesetz ("StromStG" or "the Electricity Tax Act"), Energiesteuergesetz ("EnergieStG" or "the Energy Tax Act"), Erneuerbare-Energien-Gesetz's Reduced Surcharge Program (the "Reduced EEG Surcharge Program" or "EEG Program") and Konzessionsabgabenverordung (the "KAV Program" or the "Concession Fee Ordinance Program"). *See BGH Edelstahl*, 600 F. Supp. 3d at 1248 n.2; *Second Remand Redetermination* at 18.

BGH provides four reasons that, in its view, none of the subsidization programs is particular. First, "Sections 9a, 9b, and 10 of the Electricity Tax Act are available to and used by thousands of companies throughout the German manufacturing sector, producing a myriad of products from glass and bricks to metals and chemicals." *Id.* at 7. Second, "The EEG Special Equalization Scheme also applied to thousands of companies throughout the German manufacturing sector." *Id.*

In response to BGH's first and second claims, defendant explains that "the 2018 Special Equalization Scheme is indeed particular to BGH Siegen and similar entities because the regulation sets an even lower artificial pricing floor for 'electricity-intensive undertakings' (such as themselves), while other German electricity users pay higher EEG surcharges." Def. Letter Br. in Resp. to Procedural Order ("Def. Resp. Br.") at 4-7, ECF No. 107 (citing *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 31,454 (Dep't of Commerce May 26, 2020) (preliminary countervailing duty determination) and accompanying Preliminary Decision Memorandum (unchanged in the final determination)); *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) (final countervailing duty determination) and accompanying IDM).

Defendant's response aligns with the explanation provided in the parallel CVD investigation, to which Commerce cited in the IDM. *See* IDM at 20. This Court upheld Commerce's conclusion in the parallel CVD investigation that BGH benefited specifically from relief provisions under the EEG, Electricity Tax Act and the Energy Tax Act. *BGH Edelstahl Siegen GmbH v. United States*, 46 CIT __, __, 600 F. Supp. 3d 1241, 1254-61 (2022). The Court explained that although the Electricity Tax Act and the Energy

Tax Act imposed additional taxes on companies, certain companies could apply for relief under specific provisions, such as Sections 9a, 9b, 10 of the Electricity Tax Act or Sections 51 and 55 of the Energy Tax Act, if the companies met requirements like energy-efficiency measures. *Id.* at 1253-54. Because BGH qualified for and used these programs, it paid less tax than it otherwise would have, meaning it received a benefit. *Id*. at 1254. That benefit was limited to certain eligible manufacturers like BGH, rather than all companies. *Id.* at 1253-57.

Similarly, the Court held that the EEG Special Equalization Scheme was used as a mechanism "to distribute among electricity consumers the cost of promoting renewable energy sources" but that customers certified as "electricity-intensive undertakings . . . are entitled to a reduction in their EEG surcharge." *Id.* at 1259. The Court concluded that "[t]he reduction of the surcharges lowered BGH's energy costs. Because BGH was able to receive energy for a lesser cost, Commerce's determination that BGH received a benefit was reasonable." *Id.* at 1260.

In the IDM, Commerce cited to the Court's holding in the parallel CVD investigation to support the proposition that BGH benefitted from the Special Equalization Scheme, the Energy Tax Act, and the Electricity Tax Act, and that "[t]he sheer number and extent of these programs, when considered collectively, demonstrate the efforts undertaken by the German government to control the German market for electricity, thereby creating a PMS." IDM at 20-21.

In *NEXTEEL*, the Federal Circuit explained that "[t]he statute does not define 'particular market situation,' but the plain language of § 1677b(e) identifies the factual support Commerce must provide to invoke this provision." 28 F.4th at 1234.

The Federal Circuit noted that "[n]othing in the statute requires Commerce to quantify the distortion precisely. Still, a quantitative comparison showing a difference between costs incurred and costs in the ordinary course of trade could be substantial evidence supporting the existence of a particular market situation." *Id.*

Assessing this case in light of *NEXTEEL*, the court concludes that Commerce demonstrated that the EEG Special Equalization, the Electricity Tax Act and the Energy Tax Act conferred benefits targeted toward electricity-intensive manufacturers such as BGH. The court holds also that there is substantial evidence to support Commerce's finding that the EEG Special Equalization and the Electricity Tax Act were a part of the German electricity scheme. Commerce explained how the electricity scheme was particular to BGH and found in the parallel CVD investigation that the scheme provided a specific benefit to BGH. Taken together, these findings support Commerce's conclusion that BGH particularly benefited from the government's intervention in the German electricity market.

BGH's third argument is that "[The Energy Tax Act] does not cover electricity but rather is limited to other energy products such as heating oil and natural gas." BGH Cmts. at 16. Here, defendant responds that "[a]lthough the Energy Tax Act is limited to heating oil and natural gas, these energy sources are part of the German market for energy alongside electricity." Def. Resp. Br. at 8 (citing *BGH Edelstahl*, 600 F. Supp. 3d at 1254 n.7). The court concludes that Commerce's argument—that the Energy Tax Act is a part of an overall regulatory scheme that satisfies the particularity requirement and therefore the Energy Tax Act satisfies the particularity requirement as part of that scheme—is unpersuasive. Commerce failed to explain how the Energy Tax Act, which

does not apply to electricity, contributes to distortions in electricity costs that are particular to producers of the subject merchandise.

Finally, BGH argues that Commerce erred in considering benefits from the Concession Fee Ordinance Relief Program (also known as the "KAV Program"), because in one prior case the Court found that Commerce's conclusion that the KAV Program was specific was not supported by substantial evidence. BGH Cmts. at 16; *BGH Edelstahl*, 600 F. Supp. 3d at 1269. BGH adds that the standard for particularity is higher than the standard for specificity and therefore, if electricity fails specificity, it ipso facto fails particularity. Tr. of Oral Arg. at 76:3-16, ECF No. 127 (Jan. 29, 2026).

Defendant responds that while specificity is a prerequisite for countervailability, specificity is not required for a finding of particularity in connection with a PMS determination. Def. Resp. Br. at 8. Commerce further clarified that, in addition to the fact that the CVD case as it relates to the KAV Program is still ongoing, the "PMS finding is neither directly tied to that program alone, nor is it based entirely on the CVD determination." *Second Remand Redetermination* at 18.

Similar to Commerce's explanation with regard to the Energy Tax Act, the court finds that Commerce's arguments as they relate to the KAV Program are unpersuasive. Commerce failed to explain how the KAV Program is part of "the circumstances supporting a 'particular' market situation … [that are] 'particular' to producers of the subject merchandise during the relevant period." *NEXTEEL*, 28 F.4th at 1234.

In sum, Commerce's particularity determination rests on four programs—the Electricity Tax Act, the Energy Tax Act, the EEG Special Equalization Scheme and the KAV Program. In view of this fact, the court remands for Commerce either to explain

why the Energy Tax Act and the KAV Program support Commerce's conclusion of particularity or clarify whether the remaining two programs alone are sufficient to support a conclusion that those programs created circumstances supporting a particular market situation.

### C.      Ferrochrome

The court concludes that Commerce's PMS determination with respect to the German ferrochrome market is not supported by substantial evidence.

BGH argues that Commerce failed to support its PMS finding in the German ferrochrome market because Commerce failed to show: (1) that ferrochrome from Kazakhstan was imported into Germany at distorted prices; (2) the impact the alleged distorted Kazakh imports had on the German market; and (3) how the "circumstances relating to ferrochrome from Kazakhstan are 'particular' to producers of the subject merchandise."  *See* BGH Cmts. at 17-20.

BGH argues first that Commerce failed to show that ferrochrome from Kazakhstan is exported to Germany at a distorted price.  BGH Cmts. at 17.  Specifically, BGH argues that "Commerce's determination is based solely upon information that ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer Kazachrome is state-controlled," adding that "data on imports of ferrochrome into industrialized countries show that the unit values for ferrochrome imported into Germany are consistent with the unit values for ferrochrome imported into other industrialized G20 countries."  *Id.*  BGH asserts that "Commerce simply ignores this [sic] international data and uses only the 'benchmark [U.S. Geological Survey ("USGS")] price' based on U.S. import prices," and that by doing so, "Commerce seems to impose

an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent per se a particular market situation." *Id.*

Defendant notes that "U.S. Geological Survey benchmark prices are not merely United States input prices, but instead are based on the prices of imports from *all other countries* as collected by the United States." Def. Sur-Reply at 16. Defendant adds that "although the prices of ferrochrome are consistent across the countries BGH identified, the fact that they are lower than the broader U.S. Geological Survey benchmark price is sufficient to conclude there is a distortion in the German ferrochrome market." *Id.*

In addition, in the IDM, Commerce emphasized that ferrochrome imported from Kazakhstan is produced by a state-controlled entity, Kazchrome, and that Kazakh export prices are lower than benchmark prices published by the USGS. IDM at 24.

Commerce's selection of the USGS data as a benchmark falls within Commerce's discretion to choose among reasonable data sources. Where the statute does not prescribe a particular benchmark, Commerce's methodological choices—including the selection of a benchmark dataset—are entitled to deference so long as they are reasonable. *See Dorbest Ltd. v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (2006) ("On *factual issues*, the court's role is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." (internal quotation and citations omitted)). Accordingly, the question is whether Commerce's selection of USGS data was reasonable—a standard that is satisfied here.

BGH argues also that Commerce failed to show the impact that the distorted Kazakh ferrochrome market has on the German ferrochrome market. BGH Cmts. at 19.

Specifically, BGH notes that, because Germany is part of the European Union, "ferrochrome imported into German seaports does not remain in Germany but circulates freely throughout the European Union." *Id.*

Commerce concluded that the record showed that Kazakhstan was Germany's largest source of ferrochrome imports. IDM at 24. Commerce added that because of the "importance of Kazakhstan as a source of ferrochrome in the German market," those imports had a "distortive impact" on the German ferrochrome market based on Commerce's finding that Kazakh export prices were lower than the benchmark USGS price. *Id.* Commerce added also that "there is information on the record suggesting that Kazchrome, the state-controlled producer of ferrochrome in Kazakhstan, does not make pricing decisions solely based on commercial considerations, which would affect the price of Kazakh ferrochrome sold in Germany, Italy, or any other country." *Id.* Commerce ultimately concluded: "we find that the low-priced imports of ferrochrome from Kazakhstan affect prices for this input in the German market." *Id.* at 24-25.

Commerce's explanation is incomplete. If ferrochrome is priced as a commodity, prices are generally shaped by overall supply and demand; accordingly, if Kazakh ferrochrome—imported into Germany in significant quantities at distorted prices—enters the market, those lower-priced imports could exert downward pressure on prices for ferrochrome more broadly, including ferrochrome purchased from other sources. Were those facts supported by the record and so analyzed by Commerce, it would not be necessary for BGH to have purchased ferrochrome directly from Kazakhstan for the pricing of Kazakh imports, as found by Commerce, to affect the prices BGH paid.

However, Commerce did not articulate this commodity-market rationale in its determination.

Because Commerce failed to demonstrate how Kazakhstan's role as a supplier resulted in distorted prices in Germany, the court concludes that Commerce's finding is not supported by substantial evidence and remands for further explanation or reconsideration.

Last, BGH argues that Commerce failed to show that any alleged distortion in the German ferrochrome was particular to BGH.  BGH Cmts. at 18.  BGH emphasizes that "invoices also show that almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan."  *Id.*  BGH maintains that its purchases "represented arm's length transactions with private European companies in the ordinary course of trade," which "do not meet the definition of a particular market situation."  *Id.*

BGH adds that it "did not purchase *any* ferrochrome directly from Kazakhstan. These invoices also show that *almost all* the ferrochrome purchased by BGH came from countries other than Kazakhstan."  *Id.* (emphases supplied).  The court notes that these comments leave unclear how or to what extent BGH purchased imported ferrochrome from Kazakhstan.

For its part, Commerce responded that "PMS findings are market-based and not respondent-specific."  IDM at 24.

The court will assess, based on Commerce's remand results, the relevance of the apparent lack of clarity on this factual matter.

> **D.     Whether Commerce is required to show that a "proper comparison" has been made under 19 U.S.C. § 1677(15)**

BGH argues further that Commerce failed to demonstrate how the alleged PMS distortions prevented a proper comparison between normal value and export price (or constructed export price), as required by 19 U.S.C. § 1677(15).  BGH Cmts. at 12-13.

As noted supra, section 1677(15) implicates two types of PMS: (1) a sales-based PMS, which affects the sales used for normal value calculations under § 1677b(a)(1)(B)(i); and (2) a cost-based PMS, which affects production costs used to calculate constructed value under § 1677b(e).

In *Hyundai Steel*, 19 F.4th at 1355 n.10, the Federal Circuit underscored this distinction, explaining: "The PMS provisions in section 1677b(a)(1) require a finding that a PMS exists such that there cannot be 'a proper comparison with the export price or constructed export price.'  By contrast, under section 1677b(e), Commerce may adjust constructed value when a PMS exists 'such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade.'  These are different standards."  19 F.4th at 1355 n.10 (citation omitted).

Here, Commerce did not conclude that there were any sales-based PMS affecting home-market sales, instead focusing on cost-based PMS and the use of § 1677b(e) for constructed value.  IDM at 15-36.  Accordingly, Commerce was not required to show that a PMS prevented a proper comparison between normal value and export (or constructed export) price, as required for a sale-based PMS finding.

### E.     Double remedy

Commerce found that its adjustment of BGH's electricity costs using the final electricity subsidy rates determined in the companion CVD investigation did not result in

a double remedy.  IDM at 22.  The court is not able to determine, based on Commerce's explanation, whether its conclusion is in accordance with law or supported by substantial evidence.

BGH argues that Commerce's PMS adjustment is contrary to law because the adjustment may duplicate remedies already imposed through the companion CVD investigation.  BGH Cmts. at 13-15.  BGH contends that Commerce is required to explain why the CVD remedy does not already address the market distortion underlying the PMS.  *Id.* at 13-14 (citing *Vicentin S.A.I.C. v. United States* ("*Vicentin I*"), 43 CIT __, __, 404 F.Supp.3d 1323 (2019)).

Commerce stated that using the subsidy rate found in the parallel CVD investigation to adjust for the PMS distortion does not amount to a double remedy because "AD and CVD investigations are conducted in accordance with two separate subtitles of the Act."  IDM at 21.  Commerce further stated that "in *Vicentin S.A.I.C. v. United States*, the Court found that Commerce's PMS determination was not 'precluded as a matter of law,'" and that there is no indication in the Act "directing Commerce to address potential double remedies."  *Id*. at 21-22.

As Commerce points out, the Federal Circuit has noted that AD and CVD investigations proceed under distinct statutory schemes and involve independent administrative records.  *See Vicentin S.A.I.C. v. United States* ("*Vicentin II*")*,* 42 F.4th 1372, 1380 (Fed. Cir. 2022) ("The antidumping and countervailing duty laws remedy different practices.  The countervailing duty statute broadly addresses market distortions caused by foreign government subsidization, while the antidumping statute focuses on whether a domestic industry is being injured by foreign producers or exporters selling

imported merchandise at 'less than its fair value.'"*); see also Yama Ribbons Co. v. United States*, 36 CIT 1250, 1256, 865 F. Supp. 2d 1294, 1300 (2012) ("[A]ntidumping duty and countervailing duty investigations operate pursuant to different statutory provisions, are separate administrative proceedings, and as such, each investigation has its own unique and separate administrative record.").

The Federal Circuit explained that a PMS adjustment does not result necessarily in a double remedy, even when the particular market situation is caused by a subsidy addressed in a parallel CVD proceeding. *See Vicentin II,* 42 F.4th at 1380-81. The Federal Circuit explained that a PMS adjustment seeks to correct an understatement of normal value, rather than duplicating a countervailing duty remedy. *Id.*

Notably in *Vicentin II*, the Federal Circuit concluded that there was no double remedy issue because Commerce based constructed value on data external to the distorted market, holding that "there is no risk of double counting in this case. We therefore need not address [plaintiff's] argument that the statute does not allow Commerce to make an adjustment that results in a double remedy or that creates a risk of a double rem*edy." Id.* at 1382. Here, by contrast, Commerce "adjusted the respondent's electricity costs using the final electricity subsidy rates Commerce found for BGH in the companion CVD investigation." IDM at 21. That approach may be permissible without creating a double remedy, but Commerce must explain why that is so.

This Court in *Vicentin I* noted further that Congress, in response *to GPX Int'l Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011), enacted legislation in 2012 authorizing Commerce to apply countervailing duties to non-market economy imports

while requiring reductions in overlapping antidumping duties to avoid "double counting."  43 CIT at __, 404 F. Supp. 3d at 1339; *see* 19 U.S.C. § 1677f-1(f).  The Court then noted that, three years later, Congress enacted the TPEA, authorizing Commerce to adjust CVD calculations upon finding a PMS.  *Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1339.  Congress did not mention double remedies in the TPEA, indicating no statutory limitation on the type of adjustment Commerce made here.  *Id.* The *Vicentin I* Court held that "Congress did not reference the potential for a double remedy in [§ 1677b(e)].  The omission illustrates further the lack of a statutory proscription on the type of adjustment Commerce made here."  *Id.* (citing 19 U.S.C. § 1677a(c)(1)(C); 19 U.S.C. § 1677f-1(f); and 19 U.S.C. § 1677b(c) as examples of when Congress explicitly prohibited or limited double counting).  The Court noted, however, that in selecting a calculation methodology under § 1677b(e), Commerce "is bound by reasonableness" under the substantial evidence standard.  *Id.* at 1342.

In this case, Commerce failed to explain how the alleged distortions in the German electricity market have not already been remedied by the countervailing duties imposed in the parallel CVD investigation.  For that reason, the court remands the issue to Commerce for further explanation or reconsideration.

**II.     Whether Ellwood is precluded from raising alternative arguments not raised during the original investigation**

The court addresses next the parties' disagreement as to whether Commerce may use 19 U.S.C. § 1677b(f)(1)(A) to account for market distortions in its CV calculation.

**A.     Legal framework**

Parties are required to exhaust administrative remedies by raising all issues in their initial case briefs before Commerce. *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing 19 C.F.R. § 351.309(c)(2), (d)(2)).

At the same time, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.* ("*Regents*"), 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

*Regents* identified two paths that the agency may take on remand if the grounds that the agency invoked when it initially took the action are determined to be inadequate: (1) the agency may offer a fuller explanation of its reasoning at the time that it made the decision in question; or (2) the agency may take a new action and provide new reasoning for that action. *Id*. at 20-21.

If the agency is simply explaining or clarifying its original reasoning—the first *Regents* path—the agency may refer only to its reasons "*at the time of the agency action*" and "may not provide new ones." *Id.*

Alternatively, if the agency takes new action, the proceeding effectively resets. *Id.* at 21 ("Alternatively, the agency can 'deal with the problem afresh' by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action." (internal citation omitted)). In that situation, the agency is required to follow the procedural steps that apply to new agency action and allow parties a meaningful opportunity to comment before issuing a final determination. *See Id.*

**B.    Additional background**

Ellwood first proposed using 19 U.S.C. § 1677b(f)(1)(A) to account for market distortions in its comments on Commerce's *First Remand Redetermination*.  *See* Pls. Cmts. on First Remand Results at 12-15.  In its comments on the *Second Remand Redetermination*, Ellwood termed the § 1677b(f)(1)(A) statutory pathway as "Pathway #3," stating: "three statutory pathways have been proposed by which Commerce might adjust its calculations to account for distortion in a respondent's costs."  Pls. Cmts. at 24.[7]

Ellwood argued that Commerce may adjust its calculations by "finding that cost distortion renders a respondent's records not 'reasonably reflect[ive of] the costs associated with the production and sale of the merchandise,' and adjusting the sales below cost test (the '1677b(f)(1)(A) to 1677b(b)' approach)."  *Id.* (quoting § 1677b(f)(1)(A)).  In its first remand results, Commerce declined to consider Ellwood's alternative pathways, giving as a reason that the remand was "not the appropriate proceeding in which Commerce should address, for the first time, alternative possible interpretations of the [Federal Circuit's] analysis in *Hyundai Steel*."  *First Remand Redetermination* at 6.

In its July 24, 2023 decision reviewing Commerce's first remand results, this Court found that Commerce's decision to decline to consider Ellwood's argument was

---

[7] Ellwood described in its briefs three statutory pathways. "Pathway 1" was characterized as "finding a PMS that affects costs and adjusting the sales-below-cost test directly (the '1677b(e) to 1677b(b)' approach)," which the Federal Circuit precluded in *Hyundai Steel*, 19 F.4th at 1352-55.  Pls. Cmts. at 24-25.  "Pathway 2" was described as "finding a PMS that affects costs, concluding that the PMS renders sales price comparisons inappropriate, resorting to constructed value, ('CV'), and adjusting CV calculations (the '1677b(a)(1)(C)(iii) to 1677b(e)' approach)," which Ellwood contends was deemed unlawful in *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 2023 WL 8360080 (Fed. Cir. Dec. 4, 2023).  *Id.*

"amenable to at least three different interpretations": that (1) Commerce believed that the remand order prohibited Commerce from addressing Plaintiffs' arguments; (2) Commerce believed the arguments were forfeited because they were not raised during the original investigation; or (3) Commerce believed that considering them would require reopening the record. *Ellwood II*, 2023 WL 4703309 at *5.

The Court rejected the first and third interpretations and noted that the second interpretation—preclusion for failure to exhaust administrative remedies—"may have merit," but it concluded that Commerce had not clearly articulated its reasoning. *Id.* Because "the path of the agency's reasoning [could not] be reasonably discerned," the Court remanded the matter for clarification. *Id.* at *3 (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In its *Second Remand Redetermination*, which is currently before the Court, Commerce stated that "the current sales-based PMS allegation is entirely different from the one addressed in the investigation," which had focused on cartel activity and product differences in Germany, not on cost distortions in inputs such as ferrochrome and electricity. *Second Remand Redetermination* at 9. Commerce reasoned that because Ellwood did not raise these new cost-based arguments during the original proceeding and "did not challenge [the] sale-based PMS finding before the Court," the new allegation was untimely. *Id.*

Commerce maintained also that Ellwood's Pathway #3 argument was untimely under 19 C.F.R. § 351.301(c)(2)(ii). *Second Remand Redetermination* at 8-9. That provision requires parties to submit "allegations regarding market viability in an antidumping investigation or administrative review . . . 10 days after the respondent

interested party files the response to the relevant section of the questionnaire, unless the Secretary alters this time limit." 19 C.F.R. § 351.301(c)(2)(ii). In this case, Commerce contends that the 10-day period expired during the original investigation. *Second Remand Redetermination* at 8-9.

### C.    Analysis

The court concludes that Commerce's change in position in its *First Remand Redetermination*, following the *Hyundai Steel* decision, constituted new agency action. Accordingly, Ellwood's subsequent Pathway #3 argument was not precluded by the exhaustion requirement.

Ellwood argues that Commerce's reversal following the Federal Circuit's *Hyundai Steel* decision, from allowing a PMS adjustment when doing a price-to-price comparison, to denying it, constituted new agency action under *Regents*. Pls. Cmts. at 4. Accordingly, Ellwood contends that Commerce was required to : (1) allow parties a final opportunity to comment before issuing its redetermination under 19 U.S.C. § 1677m(g); and (2) consider "alternatives within the ambit of the existing policy." *Id.* at 6. The Court previously held that "[the] two paths offered by *Regents* map onto the Federal Circuit's opinion in *SKF*, which explains the five different approaches an agency may adopt when agency action is subject to judicial review." *Ellwood City Forge Co. v. United States,* 47 CIT __, __, 654 F. Supp. 3d 1268, 1276 (2023) (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 1027-30 (Fed. Cir. 2001)). One of those approaches permits an agency to seek remand due to "intervening events outside of the agency's control," such as a new judicial decision or statute. *Id.* at 1277. The Court reasoned that

"*Regents* requires that the agency take new agency action if it is to change its position in light of the intervening event." *Id*.

Here, the Federal Circuit's decision in *Hyundai Steel* constitutes such an intervening event. That decision prompted Commerce's first remand request and led to the removal of PMS adjustments from the sales-below-cost test. *See Ellwood I*, 600 F. Supp. 3d at 1303.

Once Commerce changed its position following *Hyundai Steel* to eliminate Pathway #1, Ellwood argued that Commerce could still account for distortions in BGH's production costs through other mechanisms—namely, Pathway #3—consistent with *Hyundai Steel*. Pls. Cmts. on First Remand Results at 11-15.

Because Commerce undertook new agency action on remand, Ellwood's subsequent Pathway #3 argument—raised after the first remand—is not forfeited under the exhaustion rule. To the extent that Commerce rejected the argument solely as untimely, Commerce's reasoning is incomplete. Pathway #3 is therefore not precluded, and the court proceeds to assess the argument on its merits.

### III.    Whether Commerce can apply a PMS or "distortion" analysis to constructed value or cost of production under 19 U.S.C. § 1677b(f)(1)(A)

Section 1677b(e) governs the calculation of normal value using CV. If Commerce determines that a PMS "exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," § 1677b(e) authorizes the agency to use "any other calculation methodology" to construct NV. 19 U.S.C. § 1677b(e).

In contrast, when Commerce calculates COP for purposes of the sales-below-cost test, § 1677b(f) establishes a separate set of rules. These rules outline how

Commerce evaluates a respondent's cost data and when Commerce may make

adjustments. In particular, § 1677b(f)(1)(A) provides:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

The court concludes that introducing a PMS "distortion" analysis through §

1677b(f)(1)(A) when calculating the cost of production or constructed value is contrary

to law.

Ellwood argues that where, as here, a respondent's reported production costs

are distorted, using those reported costs will result in a distorted comparison. Pls.

Cmts. at 16. Ellwood maintains, therefore, that "[c]onsequently, normal value may

include home market prices that only pass the sales below cost test due to the use of

distortedly low production costs." *Id*.

In particular, Ellwood argues that because BGH's reported costs were not

reflective of BGH's costs due to distortion of the electricity market, "such distorted costs

did not reasonably reflect the costs associated with the production and sale of the

merchandise within the meaning of 19 U.S.C. § 1677b(f)(1)(A)." *Id.* at 7 (internal

quotation marks omitted). For that reason, Ellwood claims that 19 U.S.C. §

1677b(f)(1)(A) provides a pathway for Commerce to address cost distortion in

conducting the sales below cost test. *Id.* at 11.

As discussed *supra*, the Federal Circuit in *Hyundai Steel* held that Congress

intended for a PMS adjustment to be available for calculations of constructed value, but

not for calculations of COP for purposes of a sales-below-cost test. *Hyundai Steel,* 19

F.4th at 1352-54.  Similarly, the Federal Circuit in *Saha Thai* added that Commerce is not allowed to make PMS adjustments to COP when determining antidumping margins under § 1677b(a), stating that "the TPEA amendment to § 1677b(e), which deals with calculating constructed value, does not automatically carry over to § 1677b(b), which deals with calculating the cost of production" and that "[t]he agency cannot use constructed value language found in § 1677b(e) as a backdoor to slip in a PMS adjustment for cost of production calculations."  *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,* 87 F.4th 1328, 1330-31 (Fed. Cir. 2023). Notably, neither case addressed the potential for § 1677b(f)(1)(A) to provide a mechanism for adjusting price-to-price antidumping comparisons to account for distorted production costs.  In fact, *Hyundai Steel* expressly declined to do so.  19 F.4th at 1356 ("We therefore do not address [Appellant's] section 1677b(f)(1)(A) argument in this case.").

In *Husteel Co., Ltd. v. United States*, 426 F. Supp. 3d 1376 (2020), the Court considered whether Commerce has statutory authority to apply a PMS adjustment when determining cost of production under § 1677b(b).  The Court reasoned that, the PMS language that Congress added in TPEA appears only in § 1677b(e), which governs the calculation of constructed value.  The TPEA amended § 1677b(e) to allow Commerce to use "any other calculation methodology" to determine constructed value when there is a PMS.  Congress did not insert comparable language in the other subsections of § 1677b, including § 1677b(b)(1) or § 1677b(f).  426 F. Supp. 3d at 1398. The Court noted that "Commerce is not authorized to tinker with the below cost sales calculation because of a PMS . . . .  The 'any other methodology' language is reserved solely for when normal value is determined by constructed value."  *Id.* at 1388.

Similarly, § 1677b(f)(1)(A) provides general instructions for determining cost of production and constructed value. The statute directs Commerce to rely on a producer's own records if they are kept in accordance with generally accepted accounting principles and reasonably reflect the costs associated with production and sale of the merchandise. The provision does not refer to a PMS or otherwise authorize Commerce to modify reported costs for perceived market distortions. *Id.* Congress' decision to include PMS authority in § 1677b(e) but not in § 1677b(f)(1)(A) indicates that the adjustment authority is meant to apply only in the constructed-value context. *See Bates v. United States*, 522 U.S. 23, 29-30, 118 S. Ct. 285, 290 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citing *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983)).

Further, allowing a PMS adjustment under § 1677b(f)(1)(A) would render the text of § 1677b(e) superfluous. The statute assigns distinct functions to its subsections: subsection (b) governs the sales-below-cost test; subsection (e) governs constructed value; and subsection (f) sets forth general cost-accounting principles. By locating the PMS provision in § 1677b(e), Congress created an exception that applies when Commerce determines normal value on the basis of constructed value. If Commerce could invoke § 1677b(f)(1)(A) to apply the same type of PMS-based cost adjustment in other contexts, that specific limitation would lose its meaning.

Accordingly, § 1677b(f)(1)(A) does not authorize Commerce to perform a PMS or "distortion" analysis under the sales-below-cost test.

In sum, Ellwood is not barred from raising its Pathway #3 argument. However, Ellwood's interpretation of § 1677b(f)(1)(A)—as requiring books and records to account for external market distortions—is not supported by the statute. Commerce's construction of § 1677b(f)(1)(A) is in accordance with law.

## CONCLUSION

For the reasons discussed above, the court sustains in part and remands in part Commerce's *Second Remand Redetermination*, it is hereby

**ORDERED** that on remand Commerce shall explain why the Energy Tax Act and the KAV Program support Commerce's conclusion of particularity or clarify whether the Electricity Tax Act and the EEG Special Equalization Scheme create circumstances sufficient to support a particular market situation finding; it is further

**ORDERED** that on remand Commerce shall explain how Kazakhstan's role as a supplier results in distorted prices in Germany; it is further

**ORDERED** that on remand Commerce shall explain how the alleged distortions in the German electricity market have not been remedied by the countervailing duties imposed in the parallel CVD investigation; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant shall have 21 days from the date of filing of the last comment to submit a response.

**SO ORDERED.**

/s/    Timothy M. Reif
Timothy M. Reif, Judge

Dated: June 29, 2026
New York, New York